**FIRST ANNAPOLIS BANCORP, INC., Plaintiff,**

and

**Federal Deposit Insurance Corporation, Plaintiff–Intervenor,**

v.

**UNITED STATES, Defendant.**

No. 94–522C.

United States Court of Federal Claims.

Nov. 27, 2002.

**530**

Dale A. Cooter, Cooter, Mangold, Tompert & Wayson, L.L.P., Washington, D.C., for the plaintiff.

Ellis Merritt, Jr., Federal Deposit Insurance Corporation Legal Division, John V. Thomas, Associate General Counsel, Washington, D.C., for plaintiff-intervenor.

James L. Anderson and Daniel D. McClain, Trial Attorneys, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, United States Department of Justice, Civil Division, Commercial Litigation, Washington, D.C., for defendant.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

The events that precipitated this and the other *Winstar*-related cases were described in the plurality opinion of the United States Supreme Court in *United States v. Winstar Corp.*, 518 U.S. 839, 844–48, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). While a full recitation of those events is unnecessary in this opinion, an outline of the facts and the regulatory system in effect during the critical period of time may be useful to place the instant case in context. The starting point is the passage of three statutes during the Great Depression, intended to stabilize the savings and loan industry:

> The Federal Home Loan Bank Act created the Federal Home Loan Bank Board (Bank Board), which was authorized to channel funds to thrifts for loans on houses and for preventing foreclosures on them. Ch. 522, 47 Stat. 725 (1932) (codified, as amended, at 12 U.S.C. §§ 1421–1449 (1988 ed.)); *see also* [H.R.Rep. No. 101–54, pt. 1, 292 (1989), U.S.Code Cong. & Admin.News 1989, pp. 86, 88]. Next, the Home Owners' Loan Act of 1933 authorized the Bank Board to charter and regulate federal savings and loan associations. Ch. 64, 48 Stat. 128 (1933) (codified, as amended, at 12 U.S.C. §§ 1461–1468 (1988 ed.)). Finally, the National Housing Act created the Federal Savings and Loan Insurance Corporation (FSLIC), under the Bank Board's authority, with responsibility to insure thrift deposits and regulate all federally insured thrifts. Ch. 847, 48 Stat. 1246 (1934) (codified, as amended, at 12 U.S.C. §§ 1701–1750g (1988 ed.)).

*United States v. Winstar Corp.*, 518 U.S. at 844, 116 S.Ct. 2432.

The regulatory system outlined by these three statutes worked well until the late 1970s and early 1980s. *Id.* at 845, 116 S.Ct. 2432. Between 1981 and 1983, however, 435 savings and loan operations failed. *Id.* Efforts by the government to deregulate the industry only exacerbated the problem, and by 1985 the estimated cost to the government to close insolvent thrifts rose to $15.8 billion,

$11.25 billion more than the Federal Savings and Loan Insurance Corporation's (FSLIC) total reserves. *Id.* at 847, 116 S.Ct. 2432.

Realizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of "supervisory mergers." *See* GAO, Solutions to the Thrift Industry Problem 52; L. White, The S & L Debacle: Public Policy Lessons for Bank and Thrift Regulation 157 (1991) (White). Such transactions, in which the acquiring parties assumed the obligations of thrifts with liabilities that far outstripped their assets, were not intrinsically attractive to healthy institutions; nor did FSLIC have sufficient cash to promote such acquisitions through direct subsidies alone, although cash contributions from FSLIC were often part of a transaction. *See* M. Lowy, High Rollers: Inside the Savings and Loan Debacle 37 (1991) (Lowy). Instead, the principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations.

*Id.* at 847–48, 116 S.Ct. 2432 (footnote omitted).

The Supreme Court in *Winstar* also recognized the impact FIRREA had on the United States regulatory banking agencies and stated that:

FIRREA made enormous changes in the structure of federal thrift regulation by (1) abolishing FSLIC and transferring its functions to other agencies; (2) creating a new thrift deposit insurance fund under the Federal Deposit Insurance Corporation; (3) replacing the Bank Board with the Office of Thrift Supervision (OTS), a Treasury Department office with responsibility for the regulation of all federally insured savings associations; and (4) establishing the Resolution Trust Corporation to liquidate or otherwise dispose of certain closed thrifts and their assets. *See* note following 12 U.S.C. § 1437, §§ 1441a, 1821.

*United States v. Winstar*, 518 U.S. at 856, 116 S.Ct. 2432.

The plaintiff, First Annapolis Bancorp, Inc. (Bancorp), as the former holding company of the converted First Federal Savings & Loan Association of Annapolis (First Federal I), filed its complaint in this *Winstar*-related case on August 10, 1994, claiming damages pursuant to various contractual and Fifth Amendment taking theories of recovery. Plaintiff-intervenor, the Federal Deposit Insurance Corporation (FDIC), as the receiver of the failed, converted thrift, filed its complaint on March 28, 1997, claiming:

That the defendant, by enactment of certain provisions of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 188 (codified as amended at 12 U.S.C. §§ 1441a, 1811 *et seq.*) ("FIRREA"), and the promulgation of implementing regulations thereunder, breached contractual obligations of the Federal Home Loan Bank Board ("FHLBB") and/or Federal Savings and Loan Insurance Corporation ("FSLIC") to the Plaintiff Intervenor, and took Plaintiff Intervenor's property without just compensation, or damaged Plaintiff Intervenor otherwise.

First Federal I was a federal mutual savings and loan association conducting business from its corporate headquarters in Annapolis, Maryland and twenty-five branch offices located in eight counties in Maryland and Baltimore city. Originally organized in 1903, First Federal I joined the Federal Home Loan Bank System in 1933 and was chartered in 1941 by the FHLBB. Until it was placed into receivership on June 1, 1990, the thrift's deposits were insured by the federal government.

Almost three years before First Federal I was placed into receivership, the thrift's board of directors met on March 18, 1987, and discussed long-term plans for First Federal I's financial future. Among other strategies, the board of directors identified a plan that would infuse outside capital through a modified conversion or a modified supervisory conversion, thereby increasing the thrift's net worth by over $5 million through 1991. The board of directors approved this strate-

gy and drafted a Regulatory Business Plan (Business Plan), determining that "[t]he institution [First Federal I] must be positioned to meet future net worth requirements if it is to remain a viable market competitor." To this end, on November 5, 1987, the board of directors submitted multiple documents to the Federal Home Loan Bank Board (FHLBB) including a regulatory Business Plan and an Application for Voluntary Supervisory Stock Conversion (Application) on November 5, 1987.

Pursuant to the Application and Business Plan, First Federal I proposed that the institution would convert from a federal mutual savings and loan association to a stock savings bank. Once converted into a stock savings bank, First Federal I would merge with and into the newly-formed interim federal stock savings bank, First Annapolis Savings Bank, F.S.B. (First Annapolis). In addition, Bancorp, the applicant, was formed for the purpose of acquiring the stock of the merged institutions and thereby infusing capital into the converted and merged thrift. First Federal I proposed that Bancorp would acquire not less then 11 million shares of First Annapolis capital stock at $1.00 per share.

The Application submitted to the FHLBB stated that Bancorp would raise the necessary funds to acquire the capital stock of First Annapolis through the sale of not less than 12 million, not more than 15 million, shares of its common stock. According to the Application, as a result of these transactions, at least $11 million would be infused into First Annapolis, and along with certain forbearances granted by the FHLBB regarding regulatory capital requirements and the amortization of goodwill, First Annapolis could "be classified as a 'viable entity' within the meaning of 12 C.F.R. § 563b.26 (b)(2) (1987)." The Application for Voluntary Supervisory Stock Conversion concluded:

The Institution [First Federal I] currently is not adequately capitalized to withstand the volatile economic and interest rate environment, competitive pressures, technological changes, and regulatory evolution that have contributed to the problems experienced by the entire savings and loan industry. It is the opinion of management

of the Institution [First Federal I] that only conversion to stock form can offer a means to acquire the capital base necessary to support the implementation of its business plan. The Institution [First Federal I] appears to meet the FHLBB's qualification for electing a supervisory form of conversion which would enable it to continue serving its community for the foreseeable future and also attain compliance with current and proposed FHLBB net worth requirements.

On July 21, 1988, the FHLBB approved the Application of First Federal I to convert to a federal stock savings bank, the formation of First Annapolis and its merger with First Federal I, and the acquisition of First Annapolis stock by Bancorp. The approval was subject to a concurrent resolution by the FHLBB that required compliance with certain conditions precedent before final approval would be granted. The FHLBB also issued regulatory forbearances granting First Annapolis exemptions to minimum regulatory capital requirements and special accounting treatment for the goodwill realized by the merger of First Federal I and First Annapolis.

The treatment of goodwill and the exemptions to minimum regulatory capital requirements were addressed in a separate agreement between Bancorp, First Annapolis, and the FSLIC in a Regulatory Capital Maintenance/Dividend Agreement, dated August 12, 1988. The agreement specified that Bancorp was obliged to maintain First Annapolis's regulatory capital in compliance with the capital requirements as set forth in the Business Plan filed with the Application by First Federal I. The Business Plan stated that "[f]or purposes of reporting to the FHLBB, the value of any intangible asset resulting from the application of push-down accounting may be amortized by First Federal [I] over a period of 25 years by the straight-line method." The purpose of the amortization of goodwill realized from the merger of the institutions stock was to "enable the preservation of capital of the new investors [Bancorp shareholders] and prevent impairment for the significant deficit being assumed by the investors in the recapitalization of the

Association [First Federal I]." The preservation of invested capital through the amortization of goodwill was accomplished by the Business Plan's use of modified regulatory capital requirements. The value seen by the accounting treatment of goodwill was used in calculating the modified regulatory capital that First Annapolis was required to maintain under the Business Plan as approved by the FHLBB. The Business Plan provided for modified regulatory capital requirements to be used for a period of five years, during which First Annapolis would come into compliance with the normal regulatory capital requirements.

On February 9, 1989, the FHLBB notified First Annapolis that "all conditions precedent have been met and the Conversion has been completed ...," and that the effective date of the conversion was August 13, 1988. In less then a year, however, First Annapolis's continued financial viability was in doubt. On January 16, 1990, the Office of Thrift Supervision (OTS) examined "the bank's [First Annapolis] rapidly deteriorating operating results and the resulting deficient capital position ...." The examination revealed that:

> The institution [First Annapolis] has experienced a significant and increasing level of losses to the extent that for the quarter ended December 31, 1989 the bank was losing in excess of $1.1 million per month (this trend has continued for the month of January 1990). The level of losses has been accelerating as a result of the significant increase in the level of non-performing assets along with the lack of new sources of non-operating income. The lack of stable earnings base is a direct result of the bank's unsound financial structure whereby non-interest earning assets represent approximately 25% of total assets. In the 16.5 months since the August 1988 supervisory stock conversion, the bank has lost $6.7 million, which is approximately one half of the $13.7 million equity capital invested and has left the institution with a severely depleted capital position.

The examination concluded that First Annapolis required "urgent aid," "immediate corrective action and constant supervisory attention," and that "formal administrative action is presumed necessary."

In August 1989, when FIRREA abolished the FSLIC, it transferred the assets and liabilities of the FSLIC to the FSLIC Resolution Fund (FRF). *See* 12 U.S.C. § 1821a (1994); *Glass v. United States,* 258 F.3d 1349, 1355 n. 5. (Fed.Cir.), *reh'g and reh'g en banc denied,* (Fed.Cir.2001). The FDIC manages and maintains the FRF. *See* 12 U.S.C. § 1821a.

The OTS is responsible for the "examination, safe and sound operation, and regulation of savings associations." 12 U.S.C. § 1463(a)(1). In addition to numerous other responsibilities, the OTS was given the authority to appoint conservatorships and receiverships to any insured savings association due, to among other grounds, insufficient assets for obligations, unsafe or unsound conditions of the savings association, substantial losses or undercapitalization. *See* 12 U.S.C. §§ 1464(d)(2), 1821(c)(5). The OTS was also given the authority to appoint the Resolution Trust Corporation (RTC) as a conservator or receiver. *See* 12 U.S.C. § 1464(d)(2)(E)(ii).

The RTC was established "to manage and resolve all cases involving depository institutions the accounts of which were insured by the Federal Savings and Loan Insurance Corporation ...." 12 U.S.C. § 1441a(b)(3)(A)(i). For purposes of this case, the RTC was given the same rights and powers to carry out its duties as the FDIC. *See* 12 U.S.C. § 1441a(b)(4)(A). Pursuant to 12 U.S.C. § 1441a(m), the RTC was abolished on December 31, 1995 and if the RTC was acting as a conservator or receiver at that time, the FDIC succeeded the RTC as conservator or receiver. *See* 12 U.S.C. § 1441a(m)(1). "When the RTC was dissolved in 1995, its assets and liabilities were also transferred to the FRF, but the FDIC, the manager of the FRF, has maintained these two sets of assets and liabilities as segregated funds within the FRF, as the FRF–FSLIC and the FRF–RTC." *Glass v. United States,* 258 F.3d at 1355 n. 5 (citing 12 U.S.C. § 1441a(m); 61 Fed.Reg. 45970, 45971–73 (Aug. 30, 1996)).

On May 31, 1990, the OTS appointed the RTC as the sole receiver for First Annapolis,

taking possession of First Annapolis on June 1, 1990, and succeeding to all rights, titles, powers, and privileges of the institution. On May 31, 1990, the OTS issued a federal charter for First Federal Savings Bank of Annapolis (First Federal II), allowing the RTC, as a conservator, to operate First Federal II as a new thrift to manage and control the assets and liabilities of the failed First Annapolis. Also on June 1, 1990, the RTC, entered into a purchase and assumption agreement with First Federal II. The purchase and assumption agreement provided for First Federal II to purchase the assets of First Annapolis in consideration for its assumption of certain liabilities, including the insured deposits of First Annapolis.

By May of 1991, the RTC, as conservator for First Federal II, determined that "severe financial conditions" threatened the "stability" of First Federal II and as a result entered into a contract of sale with the RTC in its corporate capacity (RTC Corporate) on May 3, 1991. *See* 12 U.S.C. § 1823(d) (Supp. III 1991). The contract of sale provided for the sale of certain assets of First Federal II to RTC Corporate. In addition, RTC Corporate indemnified and assumed other obligations in connection with the sale of other First Federal II assets to various insured depository institutions, in order "to save the cost of liquidation, including paying the insured accounts" of First Federal II.

The contract of sale sought to minimize the costs that RTC Corporate would face with the failure of First Federal II. Pursuant to the contract of sale, the assets of First Federal II were sold to RTC Corporate and a series of "Deposit Insurance Transfer and Asset Purchase Agreements" (Transferred Deposit Agreements) were also executed on May 3, 1991. The Transferred Deposit Agreements were made pursuant to 12 U.S.C. § 1821(f) (1988 & Supp. II 1990), and allowed RTC Corporate to provide a "Transferred Deposit" to all insured depositors of First Federal II. Under § 1821(f), RTC Corporate is directed to make either a cash payment or make "available to each depositor a transferred deposit in a new insured depository institution in the same community or in another insured depository institution in an amount equal to the insured deposit of such depositor  ...." 12 U.S.C. § 1821(f). Through the Transferred Deposit Agreements, RTC Corporate was able to sell a portion of the assets of First Federal II to healthy insured depository institutions in exchange for the transferred deposits provided to the insured depositors of First Federal II, thereby saving additional costs in the liquidation of First Federal II. First Federal II was closed on May 3, 1991.

The plaintiff's and plaintiff-intervenor's complaints point to the enactment of FIRREA and its implementing regulations as the alleged cause of First Annapolis's ultimate failure. The plaintiff and plaintiff-intervenor allege that when First Federal I applied for the voluntary supervisory conversion from a mutual savings and loan association to a stock savings association and the ultimate merger into First Annapolis, the government agreed to recognize the amortization of goodwill, its use in calculating regulatory capital requirements, and the use of modified regulatory capital requirements in exchange for the infusion of capital realized from the purchase of the merged thrifts' stock by Bancorp. The plaintiff and plaintiff-intervenor allege that with the enactment of FIRREA and its implementing regulations, the government breached this agreement by subsequently prohibiting the amortization of goodwill, the use of goodwill as part of regulatory capital and the use of modified regulatory capital requirements.

The plaintiff alleges in its complaint that the defendant "induced the creation of a holding company [Bancorp] that would sell its stock to investors and use the capital from that sale to acquire First Federal [I]." The plaintiff has requested the defendant to pay "damages resulting from breach of the Agreement and abrogation of the promises contained therein, from breach of the parties' implied-in-fact contract, and from violation of law, and just compensation for the taking of their property rights, in an amount to be determined at trial." In addition, the plaintiff has demanded "restitution of the capital invested in First Annapolis, the reasonable value of the benefits plaintiff has conferred on the United States by meeting its obli-

gation under the agreement and damages, in an amount to be determined at trial."

The plaintiff-intervenor, as successor to the RTC, the former receiver of First Annapolis, requests this court to award "damages in an amount to be established at trial, including without limitation, the loss of going concern values and any consequential damages resulting from the closure of New First Annapolis," and that:

> [T]he Court order that Plaintiff Intervenor be granted monetary relief in an amount sufficient to compensate it for all monies expended and costs incurred by Plaintiff Intervenor, and for the value of all benefits conferred on defendant, through the conversion and merger of Old First Annapolis [First Federal I] and the operation and management of New First Annapolis [First Annapolis] in an amount consistent with the evidence presented at trial.

On September 18, 1996, pursuant to an agreement entered into with the parties, then Chief Judge Smith, to whom all the *Winstar*-related cases, including this one, had been assigned, issued the Omnibus Case Management Order setting forth procedures for a short form summary judgment process for all *Winstar*-related cases. Under this order, plaintiffs in *Winstar*-related cases were permitted to file motions for summary judgment on two issues: (1) whether there was a *Winstar*-type contract; and (2) whether the government's actions were inconsistent with that contract. Defendant was given time to submit a bifurcated response, sixty days to file a response to the formation and breach issues and 120 days to raise any defenses.

On December 22, 1997, Judge Smith issued a decision in *California Federal Bank v. United States* covering four, consolidated *Winstar*-related cases. 39 Fed.Cl. 753 (1997). The court had consolidated those cases because they presented the greatest number of issues identified by the plaintiffs' coordinating committee as common to more than one *Winstar*-related case. *Id.* at 758. The defendant objected to the procedure. *Id.* The Smith court found for the plaintiffs on all eleven of the common issues it addressed. *Id.* at 779. In addition, the court ordered the defendant, in all *Winstar*-related

cases, including the one now before the court, to show cause why the court should not grant the pending short form motions for partial summary judgment on contract liability. *Id.* The defendant responded to the show cause order in this case on February 20, 1998.

The plaintiff-intervenor in this case, FDIC, filed its Short Form Motion for Partial Summary Judgment on Liability on April 1, 1998 alleging that the Application, Business Plan and forbearance letters created a contract between First Annapolis and the United States and that the government has breached the agreement when Congress enacted FIR-REA. Defendant filed its response to the plaintiff-intervenor's motion for partial summary judgment and a cross-motion for partial summary judgment on June 24, 1998, alleging that the regulatory approvals for the conversion of First Federal I to a stock savings and loan and the accompanying forbearances did not form a contract between the government and First Annapolis. The defendant claimed that the FDIC, as successor-in-interest to the converted First Federal I, could not establish the following: 1) formation of a contract with the defendant; 2) that the FHLBB had the authority to enter into the alleged contract; and asserted 3) if the court were to find the existence of a contract, the plaintiff-intervenor could not recover because any contractual commitments promised by the government would have expired within five years, as stated in the purported contract documents.

On June 30, 1998, defendant filed another response to the FDIC's motion for partial summary judgment. Defendant's second response raised, for the first time, the issue of whether the plaintiff-intervenor should be dismissed because the FDIC raised a nonjusticiable intra-governmental dispute. On September 14, 1999, the defendant filed a motion to dismiss three of plaintiff-intervenor's claims and a motion for summary judgment on its remaining claim for relief. The defendant filed a supplemental memorandum on June 14, 2001, in support of its June 24, 1998 cross-motion for partial summary judgment against the FDIC. The defendant did not address the non-contractual claims raised by the FDIC, but moved for summary judgment

against the FDIC's contractual based claims. The defendant's June 14, 2001 supplement to its cross-motion for partial summary judgment also moved the court to dismiss the FDIC for lack of standing and because the complaint submitted by the plaintiff-intervenor was not filed within the applicable period set by the statute of limitations.

On November 10, 1999, the FDIC responded to the defendant's September 14, 1999 motion to dismiss and motion for summary judgment, and alleged that pursuant to Judge Smith's order at a status conference held on September 29, 1999, plaintiff-intervenor's takings based claims were stayed and, therefore, only addressed the defendants motions as it pertained to the FDIC's contractual based claims. The defendant filed a reply to the plaintiff-intervenor's response on December 2, 1999. By order dated February 18, 2000, Judge Smith granted the FDIC's request to file a surreply to defendant's reply in support of its motion to dismiss and for summary judgment. The FDIC filed a surreply to the defendant's reply on February 18, 2000. On December 15, 2000, Judge Smith issued the following order:

> On August 5, 1999, plaintiff First Annapolis Bancorp filed a motion for entry of judgment as to damages. Defendant responded by moving to stay their obligation to respond until 28 days after the close of expert discovery and after a decision as to liability was rendered. The court has yet to rule on the motion for a stay, but the court believes the appropriate response is to let the Trial Judge who will be assigned to the case establish a rational schedule to resolve the liability and damages portions of this case. Accordingly, the court will grant defendant's motion for a stay, which shall remain in effect until such time as the Trial Judge obligates defendant to respond.

After the case was reassigned to this judge, the court held a status conference. Following the status conference, all the parties filed supplemental briefs on numerous issues in the case and have addressed recent, *Winstar*-related decisions issued by the United States Court of Appeals for the Federal Circuit, including *Landmark Land Co. v.*

*United States*, 256 F.3d 1365 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2001) and *Glass v. United States*, 258 F.3d at 1349. The *Landmark* and *Glass* decisions addressed the standing of the FDIC as the successor-in-interest of the failed thrifts in these *Winstar*-related cases and held that the claims brought by the FDIC did not give rise to an actual case-or-controversy as required by Article III, Section 2 of the Constitution. *See Landmark Land Co., v. United States*, 256 F.3d at 1380; *Glass v. United States*, 258 F.3d at 1355.

## DISCUSSION

The defendant asserts that the FDIC must be dismissed from this case because the FDIC lacks standing, based on the Federal Circuit's decisions in *Landmark* and *Glass* and that "[t]he amount of damages it has claimed in this case ($27.9 million) is far less than the amount owed to the Government for paying off First Annapolis' [the converted First Federal I's] deposits (approximately $178 million)." In the alternative, the defendant alleges that the FDIC's complaint is time barred by the applicable statute of limitations.

The defendant has filed a motion to dismiss for lack of subject matter jurisdiction. Subject matter jurisdiction may be challenged at any time by the parties, by the court sua sponte, even on appeal. *Fanning, Phillips, Molnar v. West*, 160 F.3d 717, 720 (Fed.Cir.1998) (quoting *Booth v. United States*, 990 F.2d 617, 620 (Fed.Cir.), *reh'g denied* (1993)); *United States v. Newport News Shipbuilding & Dry Dock Co.*, 933 F.2d 996, 998 n. 1 (Fed.Cir.1991). Once jurisdiction is challenged by the court or the opposing party, the plaintiff bears the burden of establishing jurisdiction. *See McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed.Cir.1998); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1324 (Fed.Cir.1997); *Rocovich v. United States*, 933 F.2d 991, 993 (Fed.Cir.1991); *Bowen v. United States*, 49 Fed.Cl. 673, 675 (2001) (noting that the plaintiff bears the burden of proof on a motion to dismiss for lack of

jurisdiction); *Schweiger Constr. Co. v. United States,* 49 Fed.Cl. 188, 205 (2001); *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. 399, 404 (1994). A plaintiff must establish jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988); *Martinez v. United States,* 48 Fed.Cl. 851, 857 (2001), *aff'd in part,* 281 F.3d 1376 (Fed. Cir.2002); *Bowen v. United States,* 49 Fed. Cl. at 675; *Vanalco, Inc. v. United States,* 48 Fed.Cl. 68, 73 (2000); *Alaska v. United States,* 32 Fed.Cl. 689, 695 (1995), *appeal dismissed,* 86 F.3d 1178, 1996 WL 285759 (Fed.Cir.1996) (table). When construing the pleadings pursuant to a motion to dismiss, the court should grant the motion only if "it appears beyond doubt that [plaintiff] can prove no set of facts in support of [its] claim which would entitle [it] to relief." *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (quoting *Conley v. Gibson,* 355 U.S. 41, 46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *Consolidated Edison Co. v. O'Leary,* 117 F.3d 538, 542 (Fed.Cir.1997), *cert. denied sub nom. Consolidated Edison Co. v. Pena,* 522 U.S. 1108, 118 S.Ct. 1036, 140 L.Ed.2d 103 (1998); *see also New Valley Corp. v. United States,* 119 F.3d 1576, 1579 (Fed.Cir.), *reh'g denied, en banc suggestion declined,* (1997); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States,* 48 F.3d 1166, 1169 (Fed.Cir.), *cert. denied,* 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995); *Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989); *W.R. Cooper Gen. Contractor, Inc. v. United States,* 843 F.2d 1362, 1364 (Fed.Cir.1988) ("When the facts alleged in the complaint reveal 'any possible basis on which the non-movant might prevail, the motion must be denied.'"); *RCS Enters., Inc. v. United States,* 46 Fed.Cl. 509, 513 (2000).

Pursuant to Rule 8(a)(1) of the Rules of the Court of Federal Claims (RCFC) and Rule 8(a)(1) of the Federal Rules of Civil Procedure, a plaintiff need only state in the complaint "a short and plain statement of the grounds upon which the court's jurisdiction depends." RCFC 8(a)(1). However, "[d]etermination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." *Holley v. United States,* 124 F.3d 1462, 1465 (Fed.Cir.), *reh'g denied* (1997) (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)). "[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue,* 663 F.2d 713, 723 (7th Cir.1981), *aff'd,* 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); *see also Bradley v. Chiron Corp.,* 136 F.3d 1317, 1322 (Fed.Cir.1998) ("Conclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim.").

When deciding on a motion to dismiss based on lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. 99; *Boyle v. United States,* 200 F.3d 1369, 1372 (Fed.Cir.2000); *Perez v. United States,* 156 F.3d 1366, 1370 (Fed.Cir. 1998); *Highland Falls–Fort Montgomery Cent. School Dist. v. United States,* 48 F.3d at 1167 (citing *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991)); *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir. 1995); *Hamlet v. United States,* 873 F.2d at 1416; *Ho v. United States,* 49 Fed.Cl. 96, 100 (2001), *aff'd,* 30 Fed.Appx. 964 (Fed.Cir. 2002); *Alaska v. United States,* 32 Fed.Cl. at 695. If a defendant or the court challenges jurisdiction or plaintiff's claim for relief, however, the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. *McNutt v. Gen. Motors Acceptance Corp. of Ind.,* 298 U.S. at 189, 56 S.Ct. 780; *see also Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947); *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *Catellus Dev. Corp. v. United States,* 31 Fed.Cl. at 404–05. When considering a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to resolve any factual disputes. *See Moyer v. United States,* 190 F.3d 1314, 1318 (Fed.Cir.1999);

*Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d at 747; *see also Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1584 (Fed.Cir. 1993), *cert. denied sub nom., Cedars–Sinai Med. Ctr. v. O'Leary,* 512 U.S. 1235, 114 S.Ct. 2738, 129 L.Ed.2d 859 (1994) ("In establishing predicate jurisdictional facts, a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony."); *Vanalco v. United States,* 48 Fed.Cl. at 73 ("If the truth of the alleged jurisdictional facts is challenged in a motion to dismiss, the court may consider relevant evidence to resolve the factual dispute.").

In order for this court to have jurisdiction over a plaintiff's complaint, the Tucker Act requires that the plaintiff identify an independent substantive right enforceable against the United States for money damages. 28 U.S.C. § 1491 (1994). The Tucker Act states:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, this Act waives sovereign immunity to allow jurisdiction over claims (1) founded on an express or implied contract with the United States; (2) for a refund from a prior payment made to the government; or (3) based on federal constitutional, or statutory, or regulatory law mandating compensation by the federal government for damages sustained. *See United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), *reh'g denied,* 425 U.S. 957, 96 S.Ct. 1736, 48 L.Ed.2d 202 (1976) (citing *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. 599, 605–06, 372 F.2d 1002, 1009 (1967)); *see also Palmer v. United States,* 168 F.3d 1310, 1314 (Fed.Cir. 1999); *Stinson, Lyons & Bustamante, P.A. v. United States,* 33 Fed.Cl. 474, 478 (1995),

*aff'd,* 79 F.3d 136 (Fed.Cir.1996). A waiver of traditional sovereign immunity cannot be implied but must be "unequivocally expressed." *INS v. St. Cyr,* 533 U.S. 289, 299 n. 10, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); *United States v. Nordic Village, Inc.,* 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Ins. Co. of the West v. United States,* 243 F.3d 1367, 1372 (Fed.Cir.), *reh'g* and *reh'g en banc denied* (2001); *Saraco v. United States,* 61 F.3d 863, 864 (Fed.Cir.1995) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)), *cert. denied,* 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996).

The Tucker Act, however, merely confers jurisdiction on the United States Court of Federal Claims, " 'it does not create any substantive right enforceable against the United States for money damages.' " *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (quoting *United States v. Testan,* 424 U.S. at 398–99, 96 S.Ct. 948), *reh'g denied,* 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980); *White Mountain Apache Tribe v. United States,* 249 F.3d 1364, 1372 (Fed.Cir.), *reh'g* and *reh'g en banc denied* (2001), *cert. granted,* 535 U.S. 1016, 122 S.Ct. 1604, 152 L.Ed.2d 619 (2002); *Cyprus Amax Coal Co. v. United States,* 205 F.3d 1369, 1373 (Fed.Cir.2000); *cert. denied,* 532 U.S. 1065, 121 S.Ct. 2214, 150 L.Ed.2d 208 (2001); *New York Life Ins. Co. v. United States,* 118 F.3d 1553, 1555–56 (Fed.Cir. 1997), *cert. denied,* 523 U.S. 1094, 118 S.Ct. 1559, 140 L.Ed.2d 792 (1998); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). Individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Mitchell,* 445 U.S. at 538, 100 S.Ct. 1349. In order for a claim to be successful, the plaintiff "must also demonstrate that the source of law relied upon 'can fairly be interpreted as mandating compensation by the federal government for the damages sustained.' " *White Mountain Apache Tribe v. United States,* 249 F.3d at 1372 (quoting *United States v. Mitchell,* 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983)); *United States v. Testan,* 424 U.S. at 400, 96 S.Ct. 948;

*Tippett v. United States,* 185 F.3d 1250, 1254 (Fed.Cir.1999) ("[T]he plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States.") (quoting *James v. Caldera,* 159 F.3d 573, 580 (Fed.Cir.1998), *reh'g denied* (1999)); *Doe v. United States,* 100 F.3d 1576, 1579 (Fed.Cir. 1996), *reh'g denied, en banc suggestion declined* (1997); *Eastport Steamship Corp. v. United States,* 178 Ct.Cl. at 607, 372 F.2d at 1009.

### Statute of Limitations

The defendant has raised to this court the six year statute of limitations as a justification for the court to dismiss the plaintiff-intervenor's complaint. *See* 28 U.S.C. § 2501 (2000). The defendant states that "[b]ecause the FDIC filed its complaint more than six years after its claim accrued, and because no Executive Officer may extend the statute of limitations at issue here, 28 U.S.C. § 2501, the FDIC's complaint is timed barred, notwithstanding the 1995 agreement between the Department of Justice and the RTC."

Pursuant to 28 U.S.C. § 2501, "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. "In the Court of Federal Claims, the statute of limitations is jurisdictional, because filing within the six-year period was a condition of the waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1491(a)(1)." *Caguas Cent. Fed. Sav. Bank v. United States,* 215 F.3d 1304, 1310 (Fed.Cir.2000), *cert denied* 531 U.S. 1070, 121 S.Ct. 759, 148 L.Ed.2d 661 (2001). "The six-year statute of limitations set forth in the statute is an 'express limitation on the Tucker Act's waiver of sovereign immunity,' and consequently may not be waived by either the Court of Federal Claims or the parties." *Alder Terrace, Inc. v. United States,* 161 F.3d 1372, 1376–77 (Fed.Cir.1998) (citing *Hart v. United States,* 910 F.2d 815, 817–19 (Fed.Cir.1990)).

The plaintiff-intervenor filed its complaint on March 28, 1997. The enactment of FIRREA occurred in August 1989 and the imple-menting regulations went into effect on December 7, 1989. The plaintiff-intervenor's complaint states that the FDIC seeks recovery based on four theories of recovery: 1) the enactment of FIRREA and the implementing regulations constituted a repudiation and abrogation of its contract rights and effected a deprivation of plaintiff-intervenor's property without just compensation and without due process of law, in violation of the Fifth Amendment to the United States Constitution; 2) the provisions of FIRREA and the implementing regulations constituted a repudiation and breach of plaintiff-intervenor's contract rights; and 3) the breach of the defendant's contractual agreements by FIRREA and the OTS regulations frustrated the purpose of First Annapolis' contract with FHLBB and FSLIC and deprived plaintiff-intervenor of the consideration for which it had bargained.

The plaintiff-intervenor asserts that the FDIC's complaint is timely under 28 U.S.C. § 2501, based on four grounds:

(1) the Government and the Resolution Trust Corporation ("RTC") entered agreements that tolled the statute of limitations; (2) the limitation period is subject to equitable tolling and should be tolled in this case; (3) the FDIC's claims relate back to the Shareholder Plaintiffs' [Bancorp] Complaint, filed August 10, 1994; and (4) the FIRREA limitations period is tollable by agreement.

The United States Court of Federal Claims addressed similar claims asserted by the FDIC in *Westfed Holdings, Inc. v. United States,* 52 Fed.Cl. 135 (2002) and *Admiral Financial Corp. v. United States,* 51 Fed.Cl. 366, 368–69 (2002). The *Westfed* court addressed a FDIC complaint filed out of time and noted that the arguments made by the FDIC "have consistently failed in this court." *Westfed Holdings Inc. v. United States,* 52 Fed.Cl. 135, 144 (2002). The court found that "[p]ersuasive recent case law has (1) rejected tolling agreements as having no legal effect in the *Winstar* context; [and] (2) decided that the FDIC as a government agency with its own legal department does not present the factual setting in which the doctrine of equitable tolling is properly in-

voked . . . ." *Id.* at 144–45. The arguments presented by the FDIC in this case are remarkably similar to the arguments argued before the court in *Westfed Holdings Inc. v. United States,* 52 Fed.Cl. at 144–145 and *Admiral Fin. Corp. v. United States,* 51 Fed. Cl. at 368–69.

■ The plaintiff-intervenor first claims that the FDIC's predecessor, the RTC, entered into a valid and binding agreements with the defendant that tolled the statute of limitations in this case. The plaintiff-intervenor states, "[t]he Tolling Agreements can serve to toll § 2501 because this statute of limitations is subject to equitable tolling, and therefore constitutes a 'true' statute of limitations that can also be—and was in this case—tolled by the express agreement of the United States."[1] Because the statute of limitations is jurisdictional in this court, a tolling agreement entered into by the FDIC and the DOJ cannot expand the court's jurisdiction by altering the time limitations set out in 28 U.S.C. § 2501. *See Admiral Fin. Corp. v. United States,* 51 Fed.Cl. at 368 ("The Attorney General has no more authority than does the Court to alter the terms of the statutory waiver of sovereign immunity contained within Section 2501."); *Castle v. United States,* 48 Fed.Cl. 187, 194 (2000) ("The FDIC's agreement with the Department of Justice to toll the statute of limitations is a legal nullity."), *aff'd in part and rev'd in part on other grounds,* 301 F.3d 1328 (Fed.Cir.2002).

The FDIC further asserts that if the court finds the tolling agreement invalid, the court should apply equitable principles to toll the running of the statute of limitations. The FDIC states that "[b]y entering the Tolling Agreements before the expiration of the limitations period, Defendant, 'induced or tricked' the FDIC 'into allowing the filing deadline to pass.'" The plaintiff-intervenor argues this court should apply the equitable tolling doctrine recognized by the United States Supreme Court in *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 95–96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), which wrote "that the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States."

■ The plaintiff-intervenor fails to acknowledge, however, that the equitable tolling in suits against the government is limited in its application. *See id.* at 96, 111 S.Ct. 453 ("Federal courts have typically extended equitable relief only sparingly."). Moreover, as the Court in *Irwin* held, the principles of equitable tolling apply to:

> [S]ituations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.

*Id.* at 96, 111 S.Ct. 453 (footnotes omitted); *see also Young v. United States,* 535 U.S. 43, ——, 122 S.Ct. 1036, 1041, 152 L.Ed.2d 79 (2002).

■ As the court found in *Admiral,* "[t]he FDIC, as a government agency with its own legal department, hardly presents the equities in which we might apply the doctrine of equitable tolling." *Admiral Fin. Corp. v. United States,* 51 Fed.Cl. at 369; *see also Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed.Cir.1988) (holding that "the statute of limitations can be tolled where the government fraudulently or deliberately conceals material facts relevant to a plaintiff's claim so that the plaintiff was unaware of their existence and could not have discovered the basis of his claim."). "[T]he principles of equitable tolling described above do not extend to what is at best a garden variety claim of excusable neglect." *Irwin v. Dep't of Veterans Affairs,* 498 U.S. at 96, 111 S.Ct. 453. The plaintiff-intervenor does not allege that the defendant deceived or concealed material facts, but asserts that the tolling agreements "were so unfair and misleading" as to warrant the application of equitable principles. The plaintiff-intervenor acknowledges that the

---

1. The tolling agreements allegedly were entered into by the United States Department of Justice (DOJ) and the RTC both in its corporate and receivership capacities.

tolling agreements were signed by a senior official of the RTC, Mr. William C. Collishaw, General Counsel of the RTC. In this case, the RTC succeeded by the FDIC, voluntarily chose not protect its rights within the statute of limitations period and as a result equitable tolling is unavailable. *See Young v. United States,* 535 U.S. at ——, 122 S.Ct. at 1041.

■ The plaintiff-intervenor has further alleged that tolling agreements preserved the FDIC's goodwill claim regardless of whether 12 U.S.C. § 2501 was tolled. The plaintiff-intervenor also states that 12 U.S.C. § 1821(d)(14) (1994) provides a "pre-emptive federal six-year statute of limitations for contract claims brought by the FDIC as conservator or receiver." The plaintiff-intervenor makes the assertion that § 1821(d)(14) is tollable and therefore, the court should find the tolling agreement between the RTC and the defendant tolled the six year statute of limitation of § 1821(d)(14).

The plaintiff-intervenor has not provided any authority that would allow the court to substitute § 1821(d)(14) for the six year statute of limitation established by 28 U.S.C. § 2501 or that § 1821(d)(14) is tollable. As found above, 28 U.S.C. § 2501 is an "express limitation on the Tucker Act's waiver of sovereign immunity." *Alder Terrace, Inc. v. United States,* 161 F.3d at 1376–77. In fact, plaintiff-intervenor's complaint asserts this court has subject matter jurisdiction pursuant to 28 U.S.C. § 1491(a)(1). The waiver of sovereign immunity established by 28 U.S.C. § 1491(a)(1) is expressly conditioned upon a claimant filing suit within the applicable six year statute of limitations of 28 U.S.C. § 2501.

■ The plaintiff-intervenor offers one final justification for this court to sustain jurisdiction over its complaint. The plaintiff-intervenor argues that "[t]he FDIC's motion to intervene and complaint in intervention relates back to the original complaint filed by the Bancorp, which asserted claims for which the Thrift [First Annapolis], and thus the FDIC, was the real party in interest." The plaintiff-intervenor further states "[i]t is logically inescapable that the FDIC's filing of the Thrift's [First Annapolis's] claims, as successor to Western Empire [sic] [First Annapolis],[2] should relate back to the assertion of the Thrift's [First Annapolis's] claims made by the Investor Plaintiffs [Bancorp]."

The plaintiff-intervenor states that "Rules 17 and 15 of this Court[3] provide useful comparisons to determine whether the FDIC's complaint in intervention relates back to the complaint filed by Bancorp." The plaintiff-intervenor also points to the decision in *Castle v. United States,* 48 Fed.Cl. at 187.

RCFC 15 pertains to amended and supplemental pleadings, but does not address an intervening party's complaint relating back to an original plaintiff's complaint. *See* RCFC 15. RCFC 17 addresses the parties in an action. *See* RCFC 17. RCFC 17(a) states that "[e]very action shall be prosecuted in the name of the real party in interest." *See* RCFC 17(a). The court in *Castle* found that "courts have uniformly held that where a suit is commenced by one who arguably has an interest in the enforcement of the claim and the real party in interest is later brought into the litigation, the joinder or substitution of the real party in interest relates back for limitations purposes to the date of the original pleading." *Castle v. United States,* 48 Fed.Cl. at 194 (citing *S. African Marine Corp. v. United States,* 640 F.Supp. 247, 253–54 (Ct. Int'l Trade 1986); *Prevor–Mayorsohn Caribbean, Inc. v. Puerto Rico Marine Mgmt., Inc.,* 620 F.2d 1, 3 n. 2 (1st Cir.1980); *Link Aviation, Inc. v. Downs,* 325 F.2d 613, 614–15 (D.C.Cir.1963)). Although the *Castle* court found that the FDIC's complaint in intervention could relate back to the date of the originally filed complaint in that case, the court ultimately held that the FDIC had to be dismissed because the complaint presented "a non-justiciable intra-governmental dispute and, as such, may not go forward here." *Castle v. United States,* 48 Fed.Cl. at 199.

**2.** The plaintiff-intervenor apparently used briefing material from an earlier filing.

**3.** The Court of Federal Claims issued revised Rules on May 1, 2002. Rules 15 and 17 of the revised Rules of the Court of Federal Claims (RCFC) include minor changes, not relevant to the issues before the court in this case.

The finding in *Castle*, that the FDIC's compliant in intervention could relate back to the originally filed complaint of the plaintiff, was based on the court's finding that "there can be no question that the contract rights brought into issue in the complaint implicate the bank's [FDIC's] rights at least to the same extent as those of the shareholder-plaintiffs." *Castle v. United States*, 48 Fed. Cl. at 195.

In another *Winstar*-related case, the court in *American Heritage Bancorp v. United States*, also found that a complaint filed by the FDIC was not barred by the statute of limitations because "to the extent [the failed bank] sought damages that may belong to the failed bank, these claims now belong to the FDIC as receiver." *Am. Heritage Bancorp v. United States*, 53 Fed.Cl. 723, 730 (2002). Relying on the complaints filed in that case, the court found that:

> [I]t [the failed bank] cannot dispute that the complaints are virtually identical in several respects and that certain of [the failed bank's] claims are so broadly crafted as to encompass claims that belong to the failed institution, and therefore its receiver, the FDIC. Following the reasoning in *Castle*, and cases cited within, this court finds that the FDIC's claims, asserted as a real party in interest, are judged to relate back to the date of the original complaint. FDIC's complaint is, therefore, deemed timely filed.

*Am. Heritage Bancorp v. United States*, 53 Fed.Cl. at 731 (footnote omitted).

The United States Court of Appeals for the Federal Circuit has addressed RCFC 17(a) and stated that the Rule "sets forth the broad and general principle that actions should be brought in the name of the real party in interest and that courts should be lenient in permitting ratification, joinder, or substitution of that party." *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1289 (Fed.Cir.1999). Decisions by other courts which have considered Rule 17(a) of the Federal Rules of Civil Procedure provide instructive guidance concerning the issues presented by joinder and RCFC 17(a).[4] For example, the Fourth Circuit has addressed the meaning of "real party in interest" and stated that "the real party in interest [is] a person who possesses the right to enforce the claim and who has a significant interest in the litigation ... which will have the effect of preventing a multiplicity of suits." *Coliseum Cartage Co. v. Rubbermaid Statesville, Inc.* 975 F.2d 1022, 1024 (4th Cir.1992) (citations omitted). The Tenth Circuit has suggested that if a defendant will not be prejudiced, the factual allegations of the complaints do not change, and the defendant is aware of the relevant parties, joinder under FRCP 17(a) may be appropriate. *See Scheufler v. Gen. Host Corp.*, 126 F.3d 1261, 1270 (10th Cir.1997). In the case before this court, the defendant has not alleged any prejudice, the factual allegations have not changed, and the defendant has always known that First Annapolis was a party to the transactions at issue. Moreover, the United States District Court for the District of Kansas observed the following:

> The real party in interest is one who has a "real, actual, material or substantial interest in the subject matter of the action." 59 Am.Jur.2d Parties § 36. The general rule that only a party to the contract can enforce the contract has been modified by the real party in interest statutes and rules. 59 Am.Jur.2d Parties § 28. One of the purposes of this modification is to relax the strict common law rules "to enable those who are directly interested but not parties to the contract to maintain an action for its breach." *Id.*

*Edward Kraemer & Sons, Inc. v. City of Kan. City, Kan.*, 874 F.Supp. 332, 335 (D.Kan.1995).

---

4. In general, the Rules of the United States Court of Federal Claims are closely patterned upon the Federal Rules of Civil Procedure. *Te–Moak Bands of W. Shoshone Indians v. United States*, 948 F.2d 1258, 1260 n. 4 (Fed.Cir.1991). Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court. *Bank of Amer., FSB v. United States*, 51 Fed.Cl. 500, 513 n. 6 (2002); *Hickman v. United States*, 43 Fed.Cl. 424, 439 (1999), *aff'd* 232 F.3d 906, 2000 WL 266486 (Fed.Cir.2000); *see, e.g., Jay v. Sec'y DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl. Ct. 67, 70 (1989).

The plaintiff and plaintiff-intervenor's complaints are grounded in the alleged contract between the First Annapolis, Bancorp, and the defendant. As described above, with the Application and Business Plan, First Federal I merged into First Annapolis. The FHLBB approved the Application of First Federal I to convert to a federal stock savings bank, the formation of First Annapolis and its merger with First Federal I, and the acquisition of First Annapolis stock by Bancorp. The FHLBB issued regulatory forbearances granting First Annapolis exemptions to minimum regulatory capital requirements and special accounting treatment for the goodwill realized by the merger of First Federal I and First Annapolis. The treatment of goodwill and the exemptions to minimum regulatory capital requirements were addressed in a separate agreement between Bancorp, First Annapolis, and the FSLIC in a Regulatory Capital Maintenance/Dividend Agreement.

In the present case, the plaintiff, Bancorp, has asserted claims for the following: 1) breach of contract; 2) violation of law; 3) breach of implied-in-fact contract; 4) promissory estoppel; 5) failure of consideration and frustration of purpose; and 6) Fifth Amendment taking. Bancorp seeks damages resulting from these claims and "restitution of the capital invested in First Annapolis, the reasonable value of the benefits plaintiff has conferred on the United States by meeting its obligation under the agreement and damages, in an amount to be determined at trial."

The FDIC has asserted similar claims against the defendant consisting of the following: 1) Fifth Amendment taking and Due Process violations; 2) breach of contract; and 3) frustration of purpose. The FDIC's complaint states that the claims arise from the defendant's enactment of FIRREA and the subsequent regulations which breached contractual obligations of the FHLBB with the plaintiff-intervenor.

As the court in *Castle* found,

The core dispute presented in the complaint involves the government's breach, occasioned by the enactment of FIRREA, of specific contractual rights which the FHLBB granted [the bank].... [T]here can be no question that the contract rights brought into issue in the complaint implicate the bank's rights at least to the same extent as those of the shareholder-plaintiffs. Therefore, the fact that the complaint filed sought recovery only in the name of the shareholder-plaintiffs (and not also the bank) can hardly provide a reason for saying that the FDIC should now be denied its rightful place in the litigation. The transaction sued on was a contract to which the bank was a party. Plainly, then, the bank had an interest in the subject matter of the suit. Hence, since the FDIC is the bank's successor-in-interest, the FDIC's intervention must be judged to relate back to the date of the original complaint's filing.

*Castle v. United States,* 48 Fed.Cl. at 195.

Based on the FDIC's capacity as the successor-in-interest to First Annapolis, the similarity of the factual basis for the allegations, and the claims for relief requested by the plaintiff's complaint and the FDIC's complaint, the FDIC is a real party in interest, which could, in theory, be joined. Therefore, the FDIC's complaint relates back to the filing of the plaintiff's complaint on August 10, 1994, pursuant to RCFC 17(a) and is not barred on the grounds of statute of limitations.

### Priority Distribution of First Annapolis Assets

Having concluded that the FDIC's intervention was timely, the court turns to the question of whether the FDIC presents a case-or-controversy for purposes of standing.

Article III, § 2 of the Constitution confines federal courts to the decision of "Cases" or "Controversies." ... Standing to sue or defend is an aspect of the case-or-controversy requirement. In order for a plaintiff's claim to satisfy the case-or-controversy requirement, resolution of that claim must affect "the legal relations of parties having adverse legal interests."

*Landmark Land Co. v. United States,* 256 F.3d at 1380 (citations omitted). The parties to a case must be adverse to one another for the case-or-controversy requirement to be met and for this court to have subject matter

jurisdiction. *See id.* at 1380. "Because the case-or-controversy requirement is a component of subject matter jurisdiction, it cannot be waived by the parties." *Id.* (citing *Sosna v. Iowa,* 419 U.S. 393, 398, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975)).

First Annapolis was placed into receivership on June 1, 1990. As the receiver of First Annapolis, the RTC became successor to the assets and liabilities of First Annapolis and was required to pay the insured deposits of the institution with cash or provide a transferred deposit in another insured institution pursuant to the National Depositor Preference Act. *See* 12 U.S.C. § 1821(d) and (f)(1) (Supp. II 1990). When the RTC paid the insured depositors of First Annapolis pursuant to 12 U.S.C. § 1821(f), the RTC was "subrogated to all rights of the depositor against such institution [First Annapolis] or branch to the extent of such payment or assumption." 12 U.S.C. § 1821(g)(1). When the RTC was abolished, the FDIC became the successor to the subrogated rights of the insured deposits held by the RTC. *See Landmark v. United States,* 256 F.3d at 1381; *Glass v. United States,* 258 F.3d at 1355 n. 5. As successor to the subrogated rights of the insured depositors, the FDIC has a claim against the assets of First Annapolis "to the extent of such payment or assumption." 12 U.S.C. § 1821(g)(1). At the oral argument before this court, the FDIC and the defendant stipulated that the FRF account managed by the FDIC identifies claims totaling over $177 million against First Annapolis.

In addition, the FDIC, as the successor to the RTC, as the receiver of First Annapolis, holds the alleged breach of contract claim against the defendant. *See Landmark v. United States,* 256 F.3d at 1371 n. 1, 1381. The plaintiff-intervenor's complaint states that the claim for damages against the United States is being brought "as successor to the rights of First Annapolis Savings Bank, F.S.B. and as manager of the FSLIC Resolution Fund [FRF–FSLIC] that succeeded by operation of law to the assets and liabilities of the Resolution Trust Corporation ('FRF–RTC')." The United States Court of Appeals for the Federal Circuit addressed a similar claim in *Glass* and held that "[a]ny award to the FDIC will essentially flow from one gov-

ernment fund to another, from the FRF–FSLIC to the FRF–RTC." *Glass v. United States,* 258 F.3d at 1355; *see also Landmark v. United States,* 256 F.3d at 1380. This is so because, as the FDIC has claimed in this case, and as the FDIC contended in *Glass:*

> [I]t is asserting the FRF–RTC's claim on behalf of Security Savings, that is, as the successor in interest to Security Savings' assets and liabilities. Accordingly, the FRF–RTC will receive the benefit of any judgment in favor of the FDIC on its breach of contract claim. Any damages paid by the United States to satisfy the FDIC's breach of contract claim, however, will also come from the FRF, specifically, from the FRF–FSLIC. Because the FSLIC was a party to the contract with Security, the damages claim is an FSLIC liability for which the FRF–FSLIC is responsible.

*Glass v. United States,* 258 F.3d at 1355 (footnote omitted); *see also Landmark v. United States,* 256 F.3d at 1380.

The Federal Circuit found in *Glass* and *Landmark* that the National Depositor Preference Act, 12 U.S.C. § 1821(d)(11) (1994), required any recovery by the FDIC in its lawsuit to necessitate payment to the FRF–RTC over all other creditors of the failed institution. *See Glass v. United States,* 258 F.3d at 1355–56; *Landmark v. United States,* 256 F.3d at 1381. In addition, in *Glass* and *Landmark* there were no uninsured depositor claims outstanding that would share the recovery if the FDIC was successful with its claims. *See Glass v. United States,* 258 F.3d at 1355–56; *Landmark v. United States,* 256 F.3d at 1381.

The 1994 version of National Depositor Preference Act applied in *Glass* and *Landmark* was enacted by Congress on August 10, 1993, in the Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66 § 3001, 107 Stat. 312, 337 (1993) (codified at 12 U.S.C. § 1821(d)(11)). *See Landmark v. United States,* 256 F.3d at 1381; *Glass v. United States,* 258 F.3d at 1356. Section 3001(c) of the Omnibus Budget Reconciliation Act of 1993 states that "[t]he amendments made by this section shall apply with respect

to insured depository institutions for which a receiver is appointed after the date of enactment of this Act." Omnibus Budget Reconciliation Act of 1993, Pub.L. No. 103–66 § 3001(c), 107 Stat. 312, 337 (1993). Since First Annapolis was placed into receivership on June 1, 1990, the 1990 version of the priority statute applies.

If the FDIC were to be successful against the defendant, the damages realized would be an asset of the failed First Annapolis which would be distributed pursuant to the National Depositor Preference Act. *See* 12 U.S.C. § 1821(d)(11) (Supp. II 1990). In this case, the FDIC, as receiver of any damages arising out of the alleged breach of contract claim must distribute the damages recovery as follows:

(11) Distribution of assets

(A) Subrogated claims; claims of uninsured depositors and other creditors

The receiver shall—

(i) retain for the account of the Corporation [FDIC] such portion of the amounts realized from any liquidation as the Corporation may be entitled to receive in connection with the subrogation of the claims of depositors; and

(ii) pay to depositors and other creditors the net amounts available for distribution to them.

12 U.S.C. § 1821(d)(11) (Supp. II 1990). Thus, the National Depositor Preference Act dictates that the receiver shall deduct from the proceeds of liquidation the amount the FDIC has paid to insured depositors. *See* 12 U.S.C. § 1821(d)(11)(A)(i).

The Federal Circuit in *Glass* and *Landmark*, construing the 1994 version of the National Depositor Preference Act, found that the FRF had priority over all other creditors to any damages recovered by the FDIC in its *Winstar*-related claims. *Glass v. United States,* 258 F.3d at 1355–56; *Landmark v. United States,* 256 F.3d at 1381. The FDIC has distinguished the holdings in *Glass* and *Landmark* asserting that because the there are "uninsured depositors and oth-

er creditors [that] have claims totaling over $600,000 against the First Annapolis receivership ..., those third party claims enjoy the same priority against the receivership as the subrogated depositor claim and thus will share in any damage recovery by FDIC, on a pro-rata basis, with the FRF–RTC." The plaintiff-intervenor relies on FDIC priority regulations for the distribution of a failed thrift's assets to argue that the uninsured depositors and other creditors will receive a pro-rata share of any recovery made in its suit against the defendant. *See* 12 C.F.R. § 360.2 (1991).[5] The FDIC's argument appears to be that unlike in the *Glass* and *Landmark* cases, which interpreted the 1994 version of the National Preference Act, Article III, Section 2 of the Constitution is satisfied because under the 1990 version of the National Preference Act and the regulations issued pursuant to that statute, part of any recovery will be distributed to the uninsured depositors and other creditors on a pro-rata basis with the FRF–RTC and will not all flow directly back to the government.

The defendant disagrees with the claim of the FDIC that any recovery by it would be shared on a pro rata basis with uninsured depositors and other creditors based on the clear language of the 12 U.S.C. § 1821(d)(11). The defendant also argues that even if the court finds that 12 C.F.R. § 360.2 compels the FDIC to share any recovery with uninsured depositors on a pro rata basis, based on the FDIC's receivership accounting records, any recovery obtained by the FDIC must be applied to the FRF–FTC subrogated depositor claims since payments have not been made on a pro rata basis between the general creditors and uninsured depositor claims and the FRF–FTC subrogated depositor claims.

At the oral argument held by the court, the defendant introduced the First Federal II Liability Register Report. The Liability Registry Report is a document generated by the FDIC that records and details the payments that have gone through the receivership of First Federal II. The Liability Regis-

5. The FDIC cites to 12 C.F.R. § 360.3 (2001), but the court agrees with the defendant that the relevant regulation is 12 C.F.R. § 360.2 (1991).

ter Report details the payments that have been made from May 3, 1991 through February 15, 2002, to the FDIC, as manager of the FRF, and to the uninsured depositors and general creditors of First Federal II. The Liability Register Report reveals that as of February 19, 2002, the FDIC has an outstanding claim balance against First Federal II of over $177 million, and the uninsured depositors and creditors have a claim balance of $662,826.81. Based on the Liability Register Report's record of distribution as of February 15, 2002, the distribution of any recovery in this litigation by the FDIC on a pro rata basis under 12 C.F.R. § 360.2 requires the FDIC to receive $26,452,834.00 before any further payments could be made to the uninsured depositors or general creditors of the former First Annapolis.

The FDIC submitted the expert report of Robert E. Liten, the Vice President and Director of the Economic Studies Program, at the Brookings Institution, Washington, D.C. Mr. Liten provided "an expert opinion on the damages recoverable by First Annapolis Savings Bank (First Annapolis or plaintiff) due to the Federal Government's (Government's or defendant's) breach of an August 1988 contract between First Annapolis and the Federal Home Loan Bank Board (FHLBB or Bank Board)." According to Mr. Liten, the maximum damages recoverable by the FDIC, as successor to the rights of First Annapolis, is $27.9 million.

On June 6, 2001, the deputy director for the division of finance of the FDIC, Ms. Karen J. Hughes, prepared a "Goodwill Financial Reporting Package" for First Federal II. The report was "prepared specifically in support of the goodwill litigation" in this case. The report examined, as of December 31, 2000, the assets and liabilities of First Federal II, its financial position after application of assumed liabilities, a unaudited statement of assets and liabilities, and an unaudited statement of operations. The report also provided the following:

Pursuant to the contract of sale documents that conveyed the goodwill claims to the FSLIC Resolution Fund—RTC (the Fund), the Fund agreed to advance the costs of litigation, and to remit to the receiver any amounts collected on such claims after deduction of these costs. Thus, expenses totaling $1.5 million, which were previously charged directly to this receivership, were moved from the receivership to the Fund during the year. ... If the final resolution of the goodwill litigation results in a monetary award to the receivership, direct and allocated indirect litigation expenses will be deducted from any proceeds distributed to the receivership. If the final resolution of the goodwill litigation does not result in a monetary award to the receivership, the Fund will absorb the expenses.

The report's deduction of litigation costs from any recovery from the goodwill contract claims pursued by the FDIC in this litigation corresponds to FDIC regulation 12 C.F.R. § 360.2. The FDIC has argued that based on 12 C.F.R. § 360, it is required to distribute any recovery from this litigation on a pro-rata basis. The same regulation provides that administrative expenses, such as the litigation expenses incurred by the FDIC in this litigation, have priority over the subrogated claims of depositors held by the FDIC, and the uninsured depositors and general creditors of First Annapolis. See 12 C.F.R. § 360.2. Applying the priority regulation, the maximum damages of $27.9 million claimed by the FDIC, if recovered, will be reduced by over $1.5 million [6] to $26.4 million before distribution on a pro rata basis. After this deduction and pursuant to 12 C.F.R. § 360.2, the entire $26.4 million would be paid to the FDIC based on a pro rata distribution. "Thus, even if the FDIC were to fully recover, all proceeds from the judgment would be paid out of the FRF, and then distributed by the FDIC right back into the FRF. Critical to the issue of standing, then, is the fact that adjudication of the FDIC's claim cannot affect any party other than the government."

6. The Goodwill Financial Reporting Package prepared by the FDIC determined that as of December 31, 2000, the litigation expenses incurred by the FDIC totaled $1.5 million. The court has not been provided with updated litigation expenses incurred by the FDIC from December 31, 2000 until today, if any.

*Landmark v. United States,* 256 F.3d at 1381; *see also Glass v. United States,* 258 F.3d at 1356.

In *American Heritage Bancorp v. United States,* the United States Court of Federal Claims addressed a similar claim by the FDIC "that the non-insured depositors and general creditors are entitled to a pro-rata recovery, and thus the FDIC has standing to assert claims on their behalf." *Am. Heritage Bancorp v. United States,* 53 Fed.Cl. at 725. The defendant in *American Heritage* alleged that the FDIC's claims did present a claim or controversy because under 12 U.S.C. § 1821(d)(11) (1988 & Supp. III 1991), Congress established a "super-priority" for the distribution of any recovery from the litigation to pay the FDIC to the extent that it paid the insured depositors. *Id.* at 725–26. The court in *American Heritage* found the language for the distribution of assets recovered by the FDIC in the litigation under section 1821(d)(11) to be ambiguous and that the FDIC's interpretation of the statute and the pro-rata distribution scheme established by 12 C.F.R. § 360.2 was "permissible under the Act and is therefore entitled to deference." *Id.* at 727. The court held that "because the FDIC is also representing the interests of the uninsured depositors and general creditors, who are entitled to share on a pro-rata basis with the government in any damage award, the FDIC has standing to maintain a damage claim with respect to that portion." *Id.* at 729.

Because the facts of the case before this court are distinguishable, the court is not required to address whether the FDIC's pro-rata priority scheme should be afforded deference as found by the court in *American Heritage.* In this case, even if the FDIC was to distribute the maximum recovery of $27.9 million, identified by its expert, Mr. Liten, the litigation expenses of over $1.5 million advanced by the FSLIC Resolution Fund–RTC as reported by the deputy director of finance for the FDIC, Ms. Hughes, must be reimbursed before any payment may be made to the uninsured depositors or general creditors of First Annapolis. Following the payment of litigation expenses, the remainder of the potential recovery, $26.4 million, must be paid directly to the FDIC, because based on the FDIC's pro-rata priority scheme of 12 C.F.R. § 360.2, the FDIC is entitled to a payment $26,452,834.00. As a result, the FDIC would not have any funds remaining from a damage award for distribution to uninsured depositors or general creditors. Therefore, unlike the holding in *American Heritage,* this case is not distinguishable from *Glass* and *Landmark,* in that the FDIC's interests are not adverse to the United States' interests. *See Am. Heritage Bancorp v. United States,* 53 Fed.Cl. at 728.

## CONCLUSION

The plaintiff-intervenor, the FDIC, does not establish a case-or-controversy within Article III of the Constitution. The court, hereby, **GRANTS** defendant's motion to dismiss, and **DISMISSES** plaintiff-intervenor's complaint. The Clerk's office shall enter judgment consistent with this opinion.

**IT IS SO ORDERED.**