**INSURANCE COMPANY OF THE WEST, Plaintiff–Appellee,**

v.

**UNITED STATES, Defendant–Appellant.**

No. 00–5039.

United States Court of Appeals, Federal Circuit.

March 23, 2001.

Robert M. Wright, Whiteford, Taylor & Preston, L.L.P., of Baltimore, MD, argued for plaintiff-appellee. With him on the brief was Gerard P. Sunderland.

James M. Kinsella, Deputy Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellant. On the brief were David M. Cohen, Director; Robert E. Kirschman, Assistant Director; and Katherine A. Barski, Attorney. Of counsel on the brief was Major James D. Slear, Attorney, Commercial Litigation Division, AFLSA/JACN, Department of the Air Force, of Arlington, VA.

Edward G. Gallagher, Wickwire Gavin, P.C., of Vienna, VA, for amicus curiae The Surety Association of America.

Before CLEVENGER, Circuit Judge, SMITH, Senior Circuit Judge,* and DYK, Circuit Judge.

## DECISION

DYK, Circuit Judge.

This case requires us to decide whether a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1491, and bring suit against the United States. We hold that the Supreme Court's decision in *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999), did not upset the longstanding rule that such a suit is not barred by the doctrine of sovereign immunity, and that this case is governed by the Supreme Court's earlier decision in *United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949).

### I

Insurance Company of the West ("ICW") issues performance and payment bonds for government contractors in accordance with the Miller Act, 40 U.S.C. § 270a(a)-(d). It brings this suit against the United States to recover $174,000 in contract funds paid to a prime contractor, P.C.E., Limited ("PCE"). ICW alleges that the government should have paid the funds to it as surety, based upon its right of subrogation.

On August 28, 1997, the United States Department of the Air Force awarded contract number F64605–97–C–0013 to PCE. The contract called for the replacement of automatic doors in the commissary at Hickham Air Force Base. ICW provided performance and payment bonds for the work to be performed by PCE.

PCE notified the United States by letter on November 21, 1997, that it would be financially unable to fulfill its obligations under the contract and that ICW would be responsible for assuming control and assuring completion of the contract. PCE "voluntarily and irrevocably" directed that all contract funds currently remaining due be paid to ICW. On December 4, 1997, ICW confirmed in writing to the contracting officer that it was to receive all payments due on the contract. On January 29, 1998, the Air Force executed a unilateral modification to change the remittance address for payments to PCE at ICW's address. ICW did not execute a takeover agreement, and the contract with PCE was never terminated. ICW financed completion of the contract to the extent of $354,744.34.

Instead of sending payment on the contract to PCE at ICW's address, the government continued to make payments directly to PCE, which apparently retained the funds and did not forward them to ICW. The government states that the Defense Finance and Accounting Service Center in Columbus, Ohio never received the contract modification. When ICW inquired about the payments, the government informed it that payments had been made to PCE and told it to "settle this problem with P.C.E."

ICW filed suit in the United States Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491, claiming entitlement to $174,000 in wrongfully disbursed funds. The government filed a motion to dismiss on the ground of sovereign immunity. Although this court had previously established in *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1161–63 (Fed.Cir. 1985), and other cases that a surety could recover from the United States payments made to a contractor after the surety had notified the government of the contractor's

---

* Senior Judge Smith heard oral argument in this appeal and participated in consideration of the case, but died on March 22, 2001. Judge Smith did not participate in the final decision, which is made by the remaining judges in accordance with Fed. Cir. Rule 47.11.

default, the government argued that the Supreme Court's decision in *Dep't of the Army v. Blue Fox, Inc.,* 525 U.S. 255, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999), had effectively overruled *Balboa* and these other cases. The government asserted that *Blue Fox* demonstrates that the government has not waived sovereign immunity for a surety's claims based on equitable subrogation.

At a hearing on August 11, 1999, the Court of Federal Claims concluded that it was bound by *Balboa,* which had not been overruled directly by *Blue Fox.* The Court of Federal Claims, however, certified the issue to this court upon motion by the government pursuant to 28 U.S.C. § 1292(d)(2). Initially, this court denied the government's petition for interlocutory appeal, finding that the Court of Federal Claims had not entered an order denying the government's motion to dismiss, and thus that there was no definitive order for this court to review. On December 10, 1999, the Court of Federal Claims entered both an Amended Order (following *Balboa* and denying the government's motion to dismiss) and also an order certifying the issue for interlocutory appeal. *Ins. Co. of the West v. United States,* No. 99–124C (Fed.Cl. Dec. 10, 1999). This court then granted the government's petition for interlocutory appeal pursuant to 28 U.S.C. § 1292(d)(2).

## II

■ Whether the United States has waived sovereign immunity for the equitable subrogation claims of a surety is a question of law, which we therefore review without deference. *See Khan v. United States,* 201 F.3d 1375, 1377 (Fed.Cir.2000).

The Miller Act requires prime contractors to post performance bonds on all federal construction contracts. *See* 40 U.S.C. § 270a. Sureties such as ICW supply these bonds. The surety guarantees that a contract will be completed in the event of the principal's default and that the government will not have to pay more than the contract price. *See United States v. Munsey Trust Co.,* 332 U.S. 234, 244, 108 Ct.Cl.

765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). A performance bond generally gives the surety the option of taking over and completing performance or of assuming liability for the government's costs in completing the contract which are in excess of the contract price. A surety has yet a third alternative. It may provide funds to an insolvent contractor to complete performance, the course which was followed here. *See Aetna Cas. & Sur. Co. v. United States,* 845 F.2d 971, 975 (Fed.Cir.1988).

■ A surety bond creates a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee (here, the government). *Balboa Ins. Co. v. United States,* 775 F.2d 1158, 1160 (Fed.Cir.1985). "If the *surety* fails to perform, the Government can sue it on the bonds." *Id.* Although in *Balboa* we reserved the question whether there was a contract or privity of contract between the government and a surety, *see id.* at 1161, we have since held that there is no such relationship. *See Ransom v. United States,* 900 F.2d 242, 244–45 (Fed.Cir.1990); *Admiralty Constr., Inc. v. Dalton,* 156 F.3d 1217, 1220–21 (Fed.Cir.1998).

Rather than relying on privity of contract, sureties traditionally have asserted claims against the government under the equitable doctrine of subrogation. This approach dates back at least to 1896, when the Supreme Court stated in *Prairie State Bank v. United States,* 164 U.S. 227, 231, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412 (1896), that the plaintiff, "as surety on the original contract, was entitled to assert the equitable doctrine of subrogation." We have specified two circumstances in which a surety may succeed to the contractual rights of a contractor against the government: when the surety takes over contract performance or when it finances completion of the defaulted contract. *See Admiralty Constr., Inc.,* 156 F.3d at 1222; *Aetna Cas. & Sur. Co.,* 845 F.2d at 975.

Before the Supreme Court's decision in *Blue Fox,* it had been well-established in

this court that a surety could sue the United States and recover not only any retainage but also any amounts paid by the United States to the contractor after the surety had notified the government of default by the contractor under the bond. *See Balboa*, 775 F.2d at 1161–63; *Nat'l Sur. Corp. v. United States*, 118 F.3d 1542, 1545 (Fed.Cir.1997); *Transamerica Ins. Co. v. United States*, 989 F.2d 1188, 1194–95 (Fed.Cir.1993). Notice from the surety to the government was essential, for the government owes no duty to the surety unless the surety notifies the government of the contractor's default under the bond. *Fireman's Fund Ins. Co. v. United States*, 909 F.2d 495, 498 (Fed.Cir.1990). In *Balboa*, we framed the ultimate factual question to be resolved by the trial court as whether a payment to the contractor rather than the surety "was a reasonable exercise of the discretion conferred on the contracting agency by the terms of the contract and the applicable law and regulations." *Balboa*, 775 F.2d at 1165. If the contracting officer did not act reasonably, the surety could recover against the government.

### III

The government argues that the Supreme Court's decision in *Blue Fox* uproots the previously-settled regime we have just described. *Blue Fox*, however, involved a subcontractor seeking to recover from the government, not a surety. In *Blue Fox*, an insolvent prime contractor failed to pay Blue Fox, a subcontractor, for work Blue Fox completed on a government construction project. After the government received notice that Blue Fox had not been fully paid, the government nevertheless disbursed additional funds to the prime contractor. The Supreme Court upheld "the long settled rule" that sovereign immunity bars subcontractors from recovering from the government when general contractors become insolvent. *Blue Fox*, 525 U.S. at 257, 264, 119 S.Ct. 687.

■ There was nothing particularly novel about the Supreme Court's holding in *Blue Fox*, even as applied to a surety of a subcontractor. It is well-established that a surety who discharges a contractor's obligation to pay subcontractors is subrogated only to the rights of the subcontractor. Such a surety does not step into the shoes of the contractor and has no enforceable rights against the government. *See United States v. Munsey Trust Co.*, 332 U.S. 234, 240–41, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947).

However, the Supreme Court in *Blue Fox* then went on to address Blue Fox's contention that "in several cases examining a surety's right of equitable subrogation, this Court suggested that subcontractors and suppliers can seek compensation directly against the Government." *Blue Fox*, 525 U.S. at 264, 119 S.Ct. 687 (citing *Prairie State Bank v. United States*, 164 U.S. 227, 231, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412 (1896); *Henningsen v. United States Fidelity & Guar. Co.*, 208 U.S. 404, 410, 28 S.Ct. 389, 52 L.Ed. 547 (1908); *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 141, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962)). The Supreme Court stated:

> None of the cases relied upon by [Blue Fox] involved a question of sovereign immunity, and, in fact, none involved a subcontractor directly asserting a claim against the Government. Instead, these cases dealt with disputes between private parties over priority to funds which had been transferred out of the Treasury and as to which the Government had disclaimed any ownership. They do not in any way disturb the established rule that, unless waived by Congress, sovereign immunity bars subcontractors and other creditors from enforcing liens on Government property or funds to recoup their losses.

*Blue Fox*, 525 U.S. at 265, 119 S.Ct. 687.

The government seizes upon the above passage to argue that there is no waiver of sovereign immunity for sureties' equitable subrogation claims. It argues that *Balboa* and other cases which have allowed equitable subrogation claims against the government are all based directly or indirectly on

*Prairie State Bank, Henningsen,* or *Pearlman.* According to the government, the Supreme Court has now made clear that these three cases do not establish the existence of a waiver of sovereign immunity for equitable subrogation claims. Thus, argues the government, *Balboa* and other similar cases are no longer valid because they cannot find the requisite waiver of sovereign immunity.

■ The government is correct that *Balboa* and its progeny relied on *Prairie State Bank, Henningsen,* or *Pearlman* to find a waiver of sovereign immunity for equitable subrogation claims against the government.[1] Furthermore, we agree with the government that, after *Blue Fox,* we can no longer rely on those three cases to find a waiver of sovereign immunity. The Supreme Court in *Blue Fox* stated clearly that none of those cases "involved a question of sovereign immunity," *Blue Fox,* 525 U.S. at 265, 119 S.Ct. 687. This court is obligated to follow the Supreme Court's interpretation in *Blue Fox* of those three cases, even though that interpretation may be dicta. *See Stone Container Corp. v. United States,* 229 F.3d 1345, 1349–50 (Fed.Cir.2000).[2]

## IV

■ A suit against the government cannot proceed absent a waiver of sovereign immunity. Waivers of sovereign immunity must be "unequivocally expressed." *United States v. Nordic Village, Inc.,* 503

U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). However, it is possible to find support for a waiver of sovereign immunity not only in statutory language, but also in statutory purposes and history. *See West v. Gibson,* 527 U.S. 212, 222, 119 S.Ct. 1906, 144 L.Ed.2d 196 (1999).

ICW relies on only one statutory basis for the waiver of sovereign immunity here the Tucker Act, 28 U.S.C. § 1491(a)(1). In relevant part, the Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The issue in this case, of course, is whether the government's consent to suit based on a contract includes consent to suit on a contract brought by a subrogee.

A similar issue was addressed and decided by the Supreme Court in *United States v. Aetna Cas. & Sur. Co.,* 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949), in the context of the Federal Tort Claims Act, 28 U.S.C. § 2671 *et. seq.* Neither the government nor the appellant cited *Aetna* in their briefs, and it was not discussed in *Blue Fox. Aetna* involved four cases brought by sureties as subrogees against the United States under the Federal Tort Claims Act. The Supreme Court addressed whether an insurance company could bring suit in its own name against the United States on a

---

1. For example, *Balboa* quoted *Prairie State Bank* for the proposition that the plaintiff, "as surety on the original contract, was entitled to assert the equitable doctrine of subrogation." *Balboa,* 775 F.2d at 1161. *Balboa* also relied upon *Newark Ins. Co. v. United States,* 144 Ct.Cl. 655, 169 F.Supp. 955 (1959), *see Balboa,* 775 F.2d at 1162, which in turn relied upon *Royal Indemnity Co. v. United States,* 117 Ct.Cl. 736, 93 F.Supp. 891 (Ct.Cl.1950) and *Nat'l Sur. Corp. v. United States,* 132 Ct.Cl. 724, 133 F.Supp. 381 (Ct.Cl.1955). *See Newark Ins. Co.,* 169 F.Supp. at 956–57. Those two cases based their discussion of the rights of sureties on *Prairie State Bank* and *Henningsen. See Royal Indem. Co.,* 93 F.Supp. at 894–97; *Nat'l Sur. Corp.,* 133 F.Supp. at 383.

2. Although not affecting our resolution of this appeal, we note that to the extent that the Supreme Court characterized *Prairie State Bank* as a "dispute[ ] between private parties over priority to funds which had been transferred out of the Treasury," *Blue Fox,* 525 U.S. at 265, 119 S.Ct. 687, the Supreme Court may have been factually mistaken. The Court of Claims opinion in that case, *Hitchcock v. United States,* 27 Ct.Cl. 185, 200 (1892), states that the disputed funds remained in the United States Treasury, and the Supreme Court's opinion in *Prairie State Bank* does not contradict that assertion. However, it is certainly true that the Supreme Court did not directly address the sovereign immunity issue in *Prairie State Bank.*

claim to which it had become subrogated by payment to an insured. The Supreme Court held that the Anti–Assignment Act (now codified at 31 U.S.C. § 3727) did not prohibit such suits because Congress had not intended for the Anti–Assignment Act to cover subrogation claims. *See Aetna,* 338 U.S. at 380, 70 S.Ct. 207.

In addition, the Supreme Court addressed whether the United States had waived sovereign immunity to suits by sureties as subrogees under the Federal Tort Claims Act. In at least two of the lower court decisions appealed in *Aetna,* the United States had argued that the suits were barred by sovereign immunity. *See Aetna Cas. & Sur. Co. v. United States,* 170 F.2d 469, 471 (2d Cir.1948); *Yorkshire Ins. Co. v. United States,* 171 F.2d 374, 375 (3rd Cir.1948). These cases rejected the government's arguments. *See Aetna Cas. & Sur. Co.,* 170 F.2d at 471; *Yorkshire Ins. Co.,* 171 F.2d at 375. By the time the cases reached the Supreme Court, the government had apparently abandoned the sovereign immunity argument. *See* Brief for United States, *United States v. Aetna Cas. & Sur. Co.,* 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949) (No. 35). The Supreme Court nevertheless considered and rejected the sovereign immunity arguments the government had made below. The Court stated:

> In arguments before a number of District Courts and Courts of Appeals, the Government relied upon the doctrine that statutes waiving sovereign immunity must be strictly construed. We think that the congressional attitude in passing the Tort Claims Act is more accurately reflected in Judge Cardozo's statement in *Anderson v. Hayes Construction Co.,* 243 N.Y. 140, 147, 153 N.E. 28, 29–30: "The exemption of the sovereign from suit involves hardship enough, where consent has been withheld. We are not to add to its rigor by refinement of construction, where consent has been announced."

*Aetna Cas. & Sur. Co.,* 338 U.S. at 383, 70 S.Ct. 207.

*Aetna* thus directly held that Congress's waiver of sovereign immunity under the Tort Claims Act included suits by subrogees. Here, at oral argument, after we had called *Aetna* to the parties' attention, the government suggested that the waiver in *Aetna* was somehow dependent on the language of the Federal Tort Claims Act, and that a similar waiver would not apply to suits under the Tucker Act. We do not agree.

■ It is true that the waiver of sovereign immunity under the Federal Tort Claims Act is particularly sweeping. *See Nordic Village, Inc.,* 503 U.S. at 34, 112 S.Ct. 1011. However, nothing in *Aetna* suggested that its holding regarding sovereign immunity was based on the Federal Tort Claims Act's broad language. Instead, we think that *Aetna* reflects a broader and more generally applicable legal principle: waivers of sovereign immunity applicable to the original claimant are to be construed as extending to those who receive assignments, whether voluntary assignments or assignments by operation of law, where the statutory waiver of sovereign immunity is not expressly limited to waivers for claims asserted by the original claimant.

■ Neither the Federal Tort Claims Act nor the Tucker Act is limited to claims asserted by the original claimant. The Federal Tort Claims Act waives immunity as to "claims against the United States, for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant." 28 U.S.C. § 1346(b). So too, the Tucker Act waives sovereign immunity for "any claim against the United States founded ... upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). The language of both acts contains an unequivocal expression waiving

sovereign immunity as to claims, not particular claimants.

Moreover, in waiving sovereign immunity, Congress legislated against a common law background. At common law, in general, contractual rights could be assigned unless the assignment would change or harm the position of the obligor, or was forbidden by statute, public policy, or the contract itself. *See Restatement (Second) of Contracts* § 317 (1981). In addition, the assignee of a claim stepped into the shoes of the assignor for all purposes: "an assignment transfers to the assignee the same right held by the assignor, with its advantages and disadvantages." *Id.* at § 340 cmt. a. Absent explicit language, we will not assume that Congress meant to change the common law rights of assignees when it waived sovereign immunity as to "claims." *See United States v. Shabani,* 513 U.S. 10, 13, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994); *Morissette v. United States,* 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952). Nor is there any reason to believe that the constitutional doctrines of sovereign immunity were designed to achieve such a change in the common law rule allowing assignees to step into the shoes of the assignor. *See The Federalist No. 81* (Alexander Hamilton) (discussing sovereign immunity in the context of the assignment of state securities in order to create diversity jurisdiction, and assuming that the assignee took no greater or lesser right to sue than the original claim holder).

Indeed, Congress's passage of the Anti–Assignment Act assumed that, absent a statutory limitation, assignees were free to bring suit against the United States. As originally enacted in 1855, the Anti–Assignment Act stated that "all transfers and assignments hereafter made of any claim upon the United States ... shall be absolutely null and void, unless the same shall be freely made and executed ... after the allowance of such claim, the ascertainment of the amount due, and the issuing of a warrant for the payment thereof." 10 Stat. 170 (1855). At the time, Senator King of New York noted that "[t]he object is to prevent claimants from putting the claim into the hands of some one who will increase the amount of it." Cong. Globe, 33rd Cong., 2nd Sess. 296 (1855). If waivers of sovereign immunity did not extend to those who receive assignments, this act would have been entirely unnecessary, for claims by assignees would have been barred by sovereign immunity.

Finally, the Supreme Court itself has consistently assumed that the waiver of sovereign immunity contained in the Tucker Act extends to assignees. *Aetna* itself cited and relied upon cases which had assumed that, notwithstanding the Anti–Assignment Act, assignees by operation of law could bring suit against the United States. *See Aetna,* 338 U.S. at 375, 70 S.Ct. 207 (citing *Erwin v. United States,* 97 U.S. 392, 14 Ct.Cl. 577, 24 L.Ed. 1065 (1878); *Seaboard Air Line Ry. v. United States,* 256 U.S. 655, 41 S.Ct. 611, 65 L.Ed. 1149 (1921); *Western Pac. R.R. Co. v. United States,* 268 U.S. 271, 45 S.Ct. 503, 69 L.Ed. 951 (1925)).

In fact, the Supreme Court's decision in *United States v. Atlantic Mutual Ins. Co.,* 298 U.S. 483, 56 S.Ct. 889, 80 L.Ed. 1296 (1936), demonstrates directly that the Tucker Act's waiver of sovereign immunity extends to a subrogee. In that case, an army transport ship owned and operated by the United States had jettisoned property in response to a fire during a voyage. An insurance company as subrogee brought suit against the United States. Although the Supreme Court did not address the relationship between subrogation and sovereign immunity, it did explicitly consider whether the government had waived immunity to the subrogee's claim. The Court first noted that "[t]he United States is not suable without its assent, and therefore a suit *in personam* against it as the owner of the vessel needed the support of a permissive statute." *Id.* at 490, 56 S.Ct. 889. The Court then held that the Tucker Act "is such a statute." *Id.* The Court went on to determine that the insurance company's claim was barred by the Tucker Act's statute of limitations.

We conclude that the Tucker Act must be read to waive sovereign immunity for assignees as well as those holding the original claim, except as barred by a statutory provision such as the Anti–Assignment Act. No act here limits the right of subrogees to bring suit against the government, and thus sovereign immunity presents no barrier to such an action.

## V

For the above-stated reasons, we conclude that a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States.[3] The Amended Order denying the United States' motion to dismiss is affirmed for the reasons stated in this opinion. We remand this case to the Court of Federal Claims for further proceedings consistent with this opinion.

## COSTS

No costs.

*AFFIRMED and REMANDED.*

---

3. The government also argues that even if sovereign immunity does not bar ICW's claim, this court's precedents have misapplied the doctrine of subrogation. The government cites *Pearlman* for the proposition that "a surety who pays the debt of another is entitled to all the rights of the person he paid," *Pearlman*, 371 U.S. at 137, 83 S.Ct. 232, and it argues that a surety that completes performance of a government contract would therefore step into the shoes of the government, not the contractor. We disagree. A contractor essentially owes the government a debt of performance, and a surety who completes performance pays that debt. We believe that *Balboa* correctly states the law of equitable subrogation. *Pearlman* stands for the proposition that the subrogee steps into the shoes both of the contractor against the government and the government against the contractor.