# United States Court of Appeals for the Federal Circuit

2007-5016


NATIONAL AMERICAN INSURANCE COMPANY,

Plaintiff-Appellee,

v.


UNITED STATES,

Defendant-Appellant.


Robert L. Magrini, Haynes Magrini & Gatewood, of Oklahoma City, Oklahoma, argued for plaintiff-appellee. With him on the brief was Brigid F. Kennedy, Kennedy Law Firm, of Oklahoma City, Oklahoma.

Kirk T. Manhardt, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. On the brief were Peter D. Keisler, Assistant Attorney General, Jeanne E. Davidson, Director, Brian M Simkin, Assistant Director, and Roger A. Hipp, Trial Attorney.

Edward G. Gallagher, The Surety & Fidelity Association of America, of Washington, DC, for amicus curiae.

Appeal from: United States Court of Federal Claims

Judge Francis M. Allegra

# United States Court of Appeals for the Federal Circuit

2007-5016

NATIONAL AMERICAN INSURANCE COMPANY,

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

———————————————

DECIDED: August 23, 2007

———————————————

Before LINN, Circuit Judge, CLEVENGER, Senior Circuit Judge, and PROST, Circuit Judge.

PROST, Circuit Judge.

The United States appeals a September 6, 2006, decision by the United States Court of Federal Claims granting summary judgment that the government violated its duty as stakeholder in a Miller Act payment bond case by making final payment to a government contractor after being notified by the payment bond surety, National American Insurance Company ("NAICO"), that it was asserting a right to contract funds after having fully discharged the debt of the contractor. Nat'l Am. Ins. Co. v. United States, 72 Fed. Cl. 451 (2006). Because the Court of Federal Claims correctly held that NAICO was equitably subrogated to the rights of the contractor whose debt it discharged, we affirm.

I. BACKGROUND

On June 11, 1996, Innovative PBX Services, Inc. ("IPBX") contracted with the United States Small Business Administration to replace the telephone system at the Department of Veterans Affairs Medical Center in Palo Alto, California. IPBX subcontracted part of this work to Nortel Communications Systems, Inc., which was succeeded by Wiltel Communications, LLC ("Wiltel"). As required by the Miller Act, 40 U.S.C. § 3131(b), IPBX executed payment and performance bonds in favor of the United States, with NAICO as the surety.[1]

After completion of its contract work, Wiltel notified NAICO that it was owed approximately $675,000 for labor and materials that IPBX had failed to pay. Wiltel then asserted a Miller Act claim under the payment bond issued to NAICO. NAICO settled Wiltel's claim, notified the government that no additional payments were to be made to IPBX due to the Miller Act claim, and requested that all remaining contract funds be held for NAICO's benefit. The government, however, did not follow NAICO's request and made its final contract payment to IPBX. As a result, NAICO filed a complaint in the Court of Federal Claims seeking damages of approximately $280,000 from the government. The Court of Federal Claims granted summary judgment in favor of

---

[1] Pursuant to the Miller Act, a contractor awarded a contract of more than $100,000 with the United States is required to furnish two bonds: a performance bond "for the protection of the Government," and a payment bond "for the protection of all persons supplying labor and material in carrying out the work." 40 U.S.C. § 3131(b). The payment bond provision was designed to provide an alternative remedy to the mechanics' liens ordinarily available on private construction projects. F.D. Rich Co. v. United States ex rel. Indus. Lumber Co., 417 U.S. 116, 122 (1974). Because "a lien cannot attach to Government property," persons supplying labor or materials on a federal construction project were to be protected by the payment bond instead. Id. at 121-22.

NAICO, holding that: (1) NAICO, as a surety that had made payments on a payment bond and satisfied all outstanding claims, was equitably subrogated to the rights of IPBX; (2) the Tucker Act's waiver of sovereign immunity extended to NAICO as an equitable subrogee of IPBX; and (3) the government violated its duty as stakeholder in the payment bond by making final payment to IPBX after being notified by NAICO that it was asserting a right to contract funds. The United States appeals to this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

### A. Standard of Review

Summary judgment is properly granted when, viewing the evidence in the light most favorable to the non-movant, the record indicates there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). We review a grant of summary judgment by the Court of Federal Claims de novo to determine whether the summary judgment standard has been correctly applied. Cienega Gardens v. United States, 194 F.3d 1231, 1238 (Fed. Cir. 1998).

### B. Payment Bond Surety Subrogation Rights

On appeal, the United States asserts that NAICO can only stand in the shoes of the subcontractor whom it paid, and since the subcontractor has no privity with the United States, there can be no Tucker Act waiver of sovereign immunity. If we disagree, the United States does not contest its liability to NAICO on the facts of this case. Thus, this case involves only the subrogation rights of a payment bond surety. Generally, "[a] surety bond creates a three-party relationship, in which the surety

becomes liable for the principal's debt or duty to the third party obligee (here, the government)." Ins. Co. of the W. v. United States, 243 F.3d 1367, 1370 (Fed. Cir. 2001) ("ICW") (citing Balboa Ins. Co. v. United States, 775 F.2d 1158, 1160 (Fed. Cir. 1985)). If a surety is unable to rely on privity of contract as the jurisdictional basis for a claim against the government, the surety may be able to invoke the doctrine of equitable subrogation to step into the shoes of the contractor for the purpose of satisfying the jurisdictional requirements of the Tucker Act, 28 U.S.C. § 1491(a). See ICW, 243 F.3d at 1373 (stating that the Tucker Act is not limited to claims asserted by the original claimant). Equitable subrogation "'is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; . . . is independent of any contractual relations between the parties,'" Pearlman v. Reliance Ins. Co., 371 U.S. 132, 136 n.12 (1962) (quoting Memphis & L.R.R. Co. v. Dow, 120 U.S. 287, 301-02 (1887)), and has a long history in settled case law.

In 1896, the Supreme Court held that a surety could apply the doctrine of equitable subrogation in seeking retained funds from the government for completing performance of a government contract under a performance bond. Prairie State Nat'l Bank v. United States, 164 U.S. 227, 240 (1896). The Court extended its holding to a payment bond surety in Henningsen v. United States Fidelity & Guaranty Co., 208 U.S. 404, 411 (1908).

In United States v. Munsey Trust Co., 332 U.S. 234 (1947), the Supreme Court revisited the rights of sureties under the doctrine of equitable subrogation. In that case, the government, prior to releasing retained funds due a payment bond surety, deducted a portion of the amount that the contractor owed the government for failing to complete

the contract. Id. at 238. In an attempt to prevent the government from setting-off a portion of the retained funds, the payment bond surety argued that it was subrogated either to the rights of the laborers and materialmen whom it had paid or to the rights of the government itself. Id. at 240-44. The Court, however, determined "that laborers and materialmen do not have enforceable rights against the United States for their compensation" and that "[o]ne who rests on subrogation stands in the place of one whose claim he had paid, as if the payment giving rise to the subrogation had not been made." Id. at 241-42. Consequently, the surety could not rely on being equitably subrogated to the rights of the laborers and materialmen to prevent the government from applying its set-off. Id. The Court also rejected the surety's argument that it could claim the rights of the government itself for the purpose of asserting a superior claim to the retained funds. Id. at 242-43. Instead, the Court held "that the government properly used its right to set off its independent claim" against the contractor. Id. at 244; see also Sec. Ins. Co. v. United States, 428 F.2d 838, 841-43 (Ct. Cl. 1970) (applying the holding in Munsey Trust and distinguishing between a performance bond surety's claim and a payment bond surety's claim with respect to the government's right to set off).

Fifteen years later, the Supreme Court again addressed the rights of sureties to recover funds retained by the government in Pearlman v. Reliance Insurance Co., 371 U.S. 132 (1962). In Pearlman, the Court revisited Prairie State and Henningsen and affirmed that "[t]hese two cases . . ., together with other cases that have followed them, establish the surety's right to subrogation in [a retained] fund whether its bond be for performance or payment." Id. at 139. The Court also rejected the argument that Munsey Trust overruled the holdings in Prairie State and Henningsen. Id. at 140-41

("Munsey left the rule in Prairie State and Henningsen undisturbed."). According to the Court: (1) the government had a right to use the retained fund to pay laborers and materialmen; (2) the laborers and materialmen had a right to be paid out of the fund; (3) the contractor, had he completed the contract and paid his laborers and materialmen, would have been entitled to the fund; and (4) the surety, having paid the laborers and materialmen, was entitled to the benefit of all these rights to the extent necessary to reimburse it. Id. at 141.

Subsequently, our predecessor court, the Court of Claims, analyzed the holdings of Munsey Trust and Pearlman in United States Fidelity & Guaranty Co. v. United States, 475 F.2d 1377 (Ct. Cl. 1973), and distinguished the rights of a performance bond surety from those of a payment bond surety with respect to the government's priority to retained funds. According to the Court of Claims, the "most apparent" manner in which to reconcile any supposed differences between Munsey Trust and Pearlman was to conclude "that the surety was entitled to the benefit of all the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid." Id. at 1381-82 (emphases added). "The surety [was then] subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States. . . . [and] subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the [United States]." Id. The Court of Claims then applied Munsey Trust's priority rule in light of these legal conclusions to hold that "[a] surety that pays on a performance bond . . . has priority over the United States to the retainages in its hands[, but that a] surety that pays on its payment bond . . . does not." Id. at 1383.

Subsequent opinions of the Court of Claims and this court have reaffirmed, either explicitly or implicitly, the decision in United States Fidelity & Guaranty. See Dependable Ins. Co. v. United States, 846 F.2d 65, 67 (Fed. Cir. 1988); Balboa, 775 F.2d at 1161; U.S. Elec. Corp. v. United States, 647 F.2d 1082, 1083-86 (Ct. Cl. 1981); Great Am. Ins. Co. v. United States, 492 F.2d 821, 828 (Ct. Cl. 1974). In particular, in Balboa, under facts similar to the present case, we held that a payment bond surety could sue the United States for damages occasioned when the government made progress payments to a contractor, despite having been notified by the surety that it had made payments to subcontractors and materialmen and that payment should not be made without the surety's consent. 775 F.2d at 1163 ("[W]e hold that both the Claims Court and this court have jurisdiction to hear the claim of a Miller Act [payment bond] surety against the United States for funds allegedly improperly disbursed to a contractor."). Accordingly, it has been well-established that a payment bond surety that discharges a contractor's obligation to pay a subcontractor is equitably subrogated to the rights of both the contractor and subcontractor.

Nonetheless, on appeal, the government argues that the Court of Federal Claims erred by declining to follow a passage in ICW that states "a surety who discharges a contractor's obligation to pay subcontractors is subrogated only to the rights of the subcontractor" and "has no enforceable rights against the government." 243 F.3d at 1371 (citing Munsey Trust Co., 332 U.S. at 240-41). The Court of Federal Claims rejected that statement as both dicta and contrary to precedent. Nat'l Am. Ins., 72 Fed. Cl. at 454. The United States, however, disagrees and argues that the Court of Federal

Claims should have followed ICW and its reliance on Munsey Trust to conclude NAICO has no enforceable rights against the government.

Dicta, as defined by this court, are "statements made by a court that are 'unnecessary to the decision in the case, and therefore[,] not precedential (although [they] may be considered persuasive).'" Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1307 (Fed. Cir. 2004) (quoting Black's Law Dictionary 1100 (7th ed. 1999)). As the government admits, "ICW involved the claim of a performance bond surety, not a claim of a payment bond surety. In that context, [the court in] ICW determined that the Tucker Act's waiver of sovereign immunity for contract claims includes a waiver of immunity from subrogation claims based on a performance bond." Reply Br. 5. Accordingly, the discussion of a payment bond surety's rights as a subrogee was unnecessary to the decision in ICW. Therefore, the Court of Federal Claims was correct to treat it as such.

Of course, the fact that we are not bound by that portion of ICW does not mean that its discussion of payment bond sureties' subrogation rights is incorrect. In this instance, however, we agree with the Court of Federal Claims that the government's reliance on ICW and Munsey Trust is misplaced.[2]

As discussed above, Munsey Trust involved a surety that claimed it was equitably subrogated to either the rights of the subcontractor whom it had paid or the rights of the government. 332 U.S. at 240-44. Although the Supreme Court rejected the surety's claim that it was equitably subrogated to the rights of the government, the

---

[2] Because ICW relies on Munsey Trust for the proposition that "a surety who discharges a contractor's obligation to pay subcontractors is subrogated only to the rights of the subcontractor," we focus our analysis on Munsey Trust.

Court agreed that the surety was equitably subrogated to the rights of the subcontractor. Id. at 241-43. Unfortunately for the surety, the subcontractor had no rights it could enforce against the United States. Id. at 242. In that context, it is correct to state that the surety was subrogated only to the rights of the subcontractor and had no enforceable rights against the government. That said, Munsey Trust never addressed the surety's ability to be equitably subrogated to the rights of the contractor whose debt it discharged. In fact, the government had already paid a portion of the contract fees due the contractor to the surety. Id. at 238. Accordingly, the case does not support the proposition that such a surety does not step into the shoes of the contractor. Quite to the contrary, our binding precedent clearly holds that a payment bond surety that discharges a contractor's obligation to pay a subcontractor is equitably subrogated to the rights of both the contractor and the subcontractor, as demonstrated by the preceding discussion.

Nonetheless, the government argues that Department of the Army v. Blue Fox, Inc., 525 U.S. 255 (1999), represents a change in the law and precludes NAICO from bringing suit against the government. Blue Fox, however, did not involve a surety asserting a claim against the government. Id. at 258. Instead, Blue Fox involved a subcontractor directly asserting a claim against the government for funds owed to it by the government's contractor. Id. at 256-57. The subcontractor did not purport to be an equitable subrogee; it sought an "equitable lien" on any funds from the contract not paid to the contractor (or any funds available or appropriated for the completion of the project). Id. at 258. As such, a surety's rights under equitable subrogation were not at issue in Blue Fox. More importantly, the government's contention that Blue Fox

precludes an equitable subrogee from bringing suit against the government was rejected by our holding in ICW. Although we agreed that "after Blue Fox, we can no longer rely on [Prairie State Bank, Henningsen, and Pearlman] to find a waiver of sovereign immunity," ICW, 243 F.3d at 1372, we nonetheless concluded that "a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States," id. at 1375. Accordingly, the government's reliance on Blue Fox is misplaced. Simply put, Munsey Trust, Blue Fox, and ICW did not change the established precedent that a payment bond surety that discharges a contractor's obligation to pay a subcontractor may be equitably subrogated to the rights of the contractor.

## III. CONCLUSION

Because the Court of Federal Claims correctly held that NAICO was equitably subrogated to the rights of the contractor whose debt it discharged, we affirm.

<u>AFFIRMED</u>