# United States Court of Appeals for the Federal Circuit

---

**GUARANTEE COMPANY OF NORTH AMERICA, USA,**
*Appellant*

**v.**

**IKHANA, LLC,**
*Appellee*

---

2018-1394

---

Appeal from the Armed Services Board of Contract Appeals in Nos. 60462, 60463, 60464, 60465, 60466, 61102, Administrative Judge James R. Sweet.

---

Decided: October 29, 2019

---

PATRICK MICHAEL PIKE, Pike & Gilliss LLC, Towson, MD, argued for appellant.

WILLIAM ATKINS SCOTT, Pederson & Scott, P.C., Charleston, SC, argued for appellee.

---

Before DYK, WALLACH, and HUGHES, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* HUGHES.

Concurring opinion filed by *Circuit Judge* WALLACH,
in which *Circuit Judge* DYK joins.

HUGHES, *Circuit Judge*.

This case involves a government contract dispute. After a contracting officer determined that Ikhana, LLC defaulted on a construction contract with the Army Corps of Engineers, Ikhana filed an appeal to the Armed Services Board of Contract Appeals. Guarantee Company of North America (GCNA), a surety that indemnified Ikhana, moved to intervene because the indemnity agreement authorized it to assume all contractual rights in the event of default. The Board denied GCNA's motion, finding that GCNA lacked standing. *Appeals of Ikhana, LLC*, ASBCA No. 60462, 17-1 BCA ¶ 36,871 (Oct. 18, 2017). Because GCNA executed its settlement agreement with the Corps after the claims at issue arose, we affirm.

I

In September 2013, the United States Army Corps of Engineers awarded Ikhana a construction contract to build a secured access lane and remote screening facility at the Pentagon by October 12, 2015. The contract required Ikhana to furnish performance and payment bonds. Ikhana procured these bonds from GCNA.

As a condition for issuing the bonds, GCNA required Ikhana to execute a general indemnity agreement. The indemnity agreement included a provision that assigned GCNA all rights under the contract if Ikhana defaulted or if GCNA made payment on any bond.

Construction did not go as planned. As Ikhana began working on the project, it encountered multiple problems with the work site that were not in the contract's specification. Each time Ikhana discovered a new problem, it had to halt work until the Corps issued a unilateral change to the contract. These stoppages and contract modifications caused significant delays and cost overruns. One

modification required the Corps to schedule a power outage at the Pentagon for the project to continue, but the Corps never scheduled the outage, and by mid-October 2015, construction had stopped.

Between October 13–27, 2015, Ikhana submitted four claims to the contracting officer seeking additional compensation and an extension of the project deadline. Ikhana argued that the unforeseen site conditions and unilateral changes to the contract significantly altered the scope of the contract. The Corps never issued a final decision on Ikhana's claims.

Between November 2015 and June 2016, seven of Ikhana's sub-contractors filed claims against GCNA's payment bond. Corps terminated Ikhana for defaulting on the contract and made a claim on the performance bond. On February 25, 2016, Ikhana appealed the termination decision and its four claims for additional compensation to the Armed Services Board of Contract Appeals.

GCNA sent Ikhana a letter demanding collateral under the indemnity agreement. The letter stated that if Ikhana did not deliver over four million dollars in collateral, "GCNA [would] take all appropriate steps to protect its rights" under the indemnity agreement. J.A. 292. Ikhana responded that the demand for collateral was premature and unreasonably high.

GCNA and the Corps began to negotiate for GCNA to tender a completion contractor. During the negotiations, Ikhana informed GCNA that it would "not [forgo] its claim against the Corps under any circumstances." J.A. 444. GCNA invoked its powers under the indemnity agreement and entered into a settlement agreement with the Corps on September 30, 2016. As part of the settlement agreement, GCNA agreed to "cause the dismissal, with prejudice, of the current pending appeals before the [Board]." J.A. 365.

GCNA sued Ikhana for declaratory judgment in the United States District Court for the Eastern District of Virginia. GCNA sought a declaration that the indemnity agreement authorized it to "settle [Ikhana's] dispute with the [Corps] and dismiss the [Board] appeal." *Guarantee Co. of N. Am. USA v. Ikhana, LLC*, No. 1:16-CV-1484, 2017 WL 1821106, at *2 (E.D. Va. May 4, 2017). The district court stayed GCNA's action pending resolution of Ikhana's Board appeal. *Id.* at *4.

GCNA moved to intervene and withdraw Ikhana's appeal before the Board on the grounds that Ikhana had assigned all contractual claims to GCNA. Ikhana opposed the motion. The Board denied the motion because GCNA lacked standing.

GCNA now appeals from the order denying intervention. We have jurisdiction over the Board's final decision under 28 U.S.C. § 1295(a)(10) and 41 U.S.C. § 7107(a)(1).

II

We review the Board's conclusions of law de novo. *Winter v. Bath Iron Works Corp.*, 503 F.3d 1346, 1350 (Fed Cir. 2007). The Board's jurisdictional determinations are conclusions of law. *England v. Swanson Grp., Inc.*, 353 F.3d 1375, 1378 (Fed. Cir. 2004). "The Board's jurisdiction is defined by the Contract Disputes Act [(CDA)]. Parties cannot, by agreement, confer upon a tribunal jurisdiction that it otherwise would not have." *United Pac. Ins. Co. v. Roche*, 380 F.3d 1352, 1356 (Fed. Cir. 2004).

The issue here is whether the Board correctly denied GCNA's attempt to intervene and replace Ikhana as the appellant. The Board's rules of procedure do not include instructions for third-party practice. *See In Re S. Powell Constr. Co.*, AGBCA No. 2004-122-1, 04-2 BCA ¶ 32,725 (Aug. 26, 2004). The limited Board decisions on the subject do not provide any clear guidance over what standards the Board uses for determining the propriety of intervention or

whether intervention is even permitted. *See id.* (collecting cases and discussing intervention under the CDA). But while the scope of third-party practice rules is murky, the outer bounds are limited by the Federal Rules of Civil Procedure, which the Board may adopt at its discretion. *Id.* A party seeking to supplant the plaintiff must be able to show that it could have initiated the complaint on its own. *Cf. United States v. 936.71 Acres of Land, More or Less, in Brevard Cty., State of Fla.*, 418 F.2d 551, 556 (5th Cir. 1969) (noting that the real-party-in-interest requirement applies equally to intervenors as it does to plaintiffs). Thus, GCNA cannot commandeer Ikhana's appeal if it could not directly appeal the contracting officer's decisions to the Board under the CDA.

 As explained below, we find that GCNA fails to meet this threshold requirement.

Congress designed the CDA "to prevent duplicative claims [being brought] before the boards and the courts." *Admiralty Constr., Inc. v. Dalton*, 156 F.3d 1217, 1221 (Fed. Cir. 1998). The CDA prevents duplicative adjudication "by supplying a single point of contact for contract claims." *Id.* (internal quotation marks omitted). Under the CDA, only contractors can appeal a contracting officer's decision to the Board. 41 U.S.C. § 7104; *Winter v. FloorPro, Inc.*, 570 F.3d 1367, 1370–71 (Fed. Cir. 2009). The CDA defines "contractor" as "a party to a Federal Government contract other than the Federal Government." 41 U.S.C. § 7101(7). This rule is strictly enforced as a jurisdictional prerequisite to any appeal before the Board. *Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344, 1350 (Fed. Cir. 2002).

Generally, a surety that enters into an indemnity agreement with a contractor is not in privity with the government or considered the contractor in the context of the CDA. *See id.* at 1351–52. But there is an exception to this rule. Under *Fireman's Fund* and its progeny, when a

surety executes a takeover agreement with the government to complete a contract, it is treated as a contractor under the CDA and can assert claims to the Board. *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1320 (Fed. Cir. 2011). However, the only contract between the surety and the government is the takeover agreement. *Id.* (citing *Fireman's Fund*, 313 F.3d at 1346). "For a claim to 'arise under' such a contract, the operative facts upon which the claim is based must have occurred after the pre-takeover contract was executed." *United Pac. Ins. Co. v. Roche*, 380 F.3d 1352, 1355–56 (Fed. Cir. 2004). "Stated differently, the Board ha[s] no jurisdiction over . . . claims . . . based upon events that occurred prior to the takeover agreement." *Id.* at 1356.

Here, GCNA entered into a settlement agreement with the Corps on September 30, 2016. Under *Fireman's Fund*, even if this agreement constitutes a takeover agreement, it would not entitle GCNA to assert claims that arose prior to this date. Because Ikhana lodged its appeal with the Board on February 25, 2016, all the claims at issue in this case necessarily arose before GCNA contracted with the Corps. As a result, GCNA cannot commandeer this appeal because it could not assert these claims in the first instance.

GCNA raises several other arguments concerning the effect of the settlement agreement. The Corps advanced similar theories before the Board, and the Board rejected them. Because these issues are part of an ongoing adjudication, we decline to address them until the Board issues a final decision.

## III

Because all claims at issue here arose before GCNA entered into its settlement agreement with the Corps, GCNA could not assert them before the Board. As a result, we affirm the Board's dismissal of GCNA's motion to intervene.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

---

**GUARANTEE COMPANY OF NORTH AMERICA, USA,**
*Appellant*

**v.**

**IKHANA, LLC,**
*Appellee*

---

2018-1394

---

Appeal from the Armed Services Board of Contract Appeals in Nos. 60462, 60463, 60464, 60465, 60466, 61102, Administrative Judge James R. Sweet.

---

WALLACH, *Circuit Judge,* concurring, in which DYK, *Circuit Judge,* joins.

I write not to contest the outcome of the above decision; it rests squarely on this court's precedent. Instead, I raise a concern regarding the rationale underlying that precedent.

## I. THE CONTRACT DISPUTES ACT AND SURETIES

My concern arises from this court's precedent regarding two fields of public contract law. First is the Contract Disputes Act ("CDA"), which regulates how U.S. executive agencies ("the Government") may contract with non-governmental entities. *See* 41 U.S.C. §§ 7101–7109 (2012).

Relevant here, the CDA provides the statutory framework for contract dispute resolution. *See id.* § 7104(a). Under the CDA, "[a] contractor[1] . . . may appeal the decision [by a Government contracting officer] to an agency board[,]" *id.* § 7104(a)—here, the Armed Services Board of Contact Appeals ("ASBCA"), *id.* § 7105(a). Limiting such appeals to the contractor is based on the policy rationale of winnowing down all claims to a "single point of contact" and so preventing a deluge of duplicative claims—with their associated costs—against the Government for any given contract. *See* S. Rep. No. 95-1118, at 16 (1978) ("the Senate Report").

The second—the Miller Act—requires all contractors in privity with the Government to post performance and payment bonds on all federal construction contracts. *See* 40 U.S.C. § 3131(b) (2008);[2] *see also* STEVEN PLITT, ET AL.,

---

[1]    In the 2011 revision and recodification of the CDA, the definition of "contractor" was amended to include the addition of "Federal" in describing "Government." *Compare* 41 U.S.C. § 601(4) (2000) (explaining that a "contractor" is "a party to a Government contract other than the Government") *with* 41 U.S.C. § 7101(a) (2012) (providing that a "contactor" is "a party to a Federal Government contract other than the Federal Government"). This insertion does not invalidate or otherwise render inapplicable our precedent regarding the CDA predating the 2011 revision, as our cases exclusively reviewed Federal Government contracts. *See* 28 U.S.C. 1295(a)(10) (2006) (granting jurisdiction to the Federal Circuit over cases arising from executive agency board of contract appeals). Accordingly, we continue to rely upon the statutory interpretation of our prior authority. Unless otherwise noted, I refer to the updated definition of "contractor."

[2]    This statute was codified at Title 40, United States Code § 270a, under the Miller Act, until 2002. *See* Pub. L.

STATUTORY BOND REQUIREMENTS–ON FEDERAL CONSTRUCTION (MILLER ACT), 11A COUCH ON INS. § 163:25 (3d ed. 2019) ("Couch on Ins.") (explaining that "under the Miller Act, [federal construction projects] require a specific form of payment and performance bonds"). A surety must post the bond, ensuring that, in the event of the contractor's default, the contract is nevertheless completed. *See* 40 U.S.C. § 3131(b). The surety ensures that the contract is completed by one of a variety of means, such as taking over the contract, finding a replacement contractor, or funding the original contractor in the case of insolvency. *See Admiralty Const. by Nat'l Am. Ins. Co. v. Dalton*, 156 F.3d 1217, 1220–21 (Fed. Cir. 1998).

Where a surety takes over the contract, we have held that the surety steps into the shoes of the original contractor and so has privity with the Government, albeit solely with respect to the contract's outstanding performance; accordingly, the surety has standing to seek redress under the CDA for claims arising out of the outstanding performance. *See Fireman's Fund Ins. Co. v. England*, 313 F.3d 1344, 1351 (Fed. Cir. 2002) (determining that, as the surety "was not a party to any contract with the government prior to the takeover agreement it had with the government" after the contractor defaulted, the surety was not a contractor for the purposes of the CDA and so could not bring CDA claims against the government).

Before the surety takes over—or in situations where the surety never executes a takeover agreement with the Government and instead ensures the contract is carried out by one of the other means—we have concluded that the surety is *not* in privity with the Government and is *not* permitted to bring claims under the CDA. *See Admiralty*, 156 F.3d at 1220–21; *Fireman's Fund*, 313 F.3d at 1351–52. It

107-217, §1, 116 Stat. 1147 (2002). Unless specified to the contrary, I will refer to the recodified version of the statute.

is my position that the two opinions upon which our subsequent decisions are built, *Admiralty* and *Fireman's Fund*, were wrongly decided because they bring Government contracting law into conflict with basic principles of suretyship and contract law.

## II. *ADMIRALTY* AND *FIREMAN'S FUND*

In *Balboa Insurance Co. v. United States*, we first addressed the relationship between the Government, a contractor, and a surety in the event of default, but we stopped short of determining whether a surety was in privity with the Government upon the default of the contractor. 775 F.2d 1158, 1160–61 (Fed. Cir. 1985). We did, however, stop short of determining whether a surety and the Government were in privity. *See id.* ("Although it is conceivable that under certain circumstances a surety could assert rights against the Government under the third-party beneficiary rule . . . or even as one in privity in contract with the Government . . . the traditional means of asserting a surety's claim is under the equitable doctrine of subrogation."); *see also Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1370 (Fed. Cir. 2001) ("[I]n *Balboa* we reserved the question whether there was a contract or privity of contract between the government and a surety.").

We took up the unanswered question in *Admiralty* and decided that no such privity existed. *See Admiralty*, 156 F.3d at 1220–21. In doing so, we noted that "the central issue in this case is whether the CDA permits [the surety] to bring a claim on behalf of [the contractor]" and concluded that both because a surety is not a contractor as defined by the CDA, *see supra* Section I, and because "[t]he CDA limits the eligibility to appeal to the boards of contract appeals *to contractors* with claims on contracts entered by a Government agency," which the surety had not done, the surety lacked the standing to bring such an appeal, *see Admiralty*, 156 F.3d at 1220–21. (emphasis added).

We next addressed "whether [the surety] can represent [the contractor] in an appeal to the [ASBCA]" and determined that, in the "limited circumstances" where the surety "take[s] over contract performance or finance[s] the completion of the defaulted contract under its performance bond," the surety may be "entitl[ed] . . . to succeed to the contractual rights of the contractor against the government." *Id.* at 1222 (internal quotation marks and citations omitted). In *Fireman's Fund*, we clarified this determination, concluding that the surety could only raise claims against the Government that arose from the work the surety itself did following the takeover of the contract and not any claims pertaining to the prior period. 313 F.3d at 1351 ("[The surety] was not a party to any contract with the government prior to the takeover agreement it had with the government, and its pre-takeover claims did not arise under such a contract.").

Our analysis in *Admiralty*, and by extension *Fireman's Fund*, gave short shrift to the argument that, because the surety and the contractor had agreed that the contractor would cede all legal rights to the surety in the event of default, the surety should assume all of the contractor's legal rights—including those to appear before a board such as the ASBCA—with respect to the contract. *See generally Admiralty*, 156 F.3d at 1220–22. Instead, we focused primarily on the Senate Report that addresses the policy rationales supporting the creation of the CDA. *Id.* at 1221.[3]

---

[3]    We also conducted a brief analysis of the plain language of the statute, noting that a surety failed to constitute a contractor as defined by the CDA. *See Admiralty*, 156 F.3d at 1220–21 (citing 41 U.S.C. § 7101(a)). If, as is explained below, the surety assumes the legal rights of the contractor at the time of default, the plain language of the statute would support the implication that the surety is a party to a Government contract. Accordingly, the following

Undergirding the rationale "for limiting the appeal right to a single 'contractor' [in] the Senate Report," we noted, was the goal to narrow the claims to those between the Government and "a 'single point of contact'—the prime contractor." *Id.* at 1220 (citing S. Rep. No. 95-1118, at 16). Limiting appeals to only a single contractor "would prevent multiple, duplicative claims and appeals by subcontractors." *Id.* (citing S. Rep. No. 95-1118, at 16). The CDA, therefore, "makes only a single 'contractor' eligible to appeal a contracting officer's final decision." *Id.* We explained that the Senate Report itself suggested the best system was one of a "single point of contact," or ensuring that only the contractor could pursue claims against the Government before the ASBCA and all other claims would be litigated elsewhere, such as between the contractor and subcontractors in district court. *See id.*; *see also* S. Rep. No. 95-1118, at 16.

A closer read of the Senate Report, however, indicates that the portion relied upon by our precedent relates wholly to precluding *subcontractors* from the administrative remedies of the CDA, *see* S. Rep. No. 95-1118, at 16–17, and speaks nothing of sureties, *see generally id. See, e.g.*, S. Rep. No. 95-1118, at 16 (explaining that "[t]he recommendations . . . specifically exclude bringing *subcontractors* under the provisions of" the CDA) (emphasis added), *id.* ("If direct access were allowed to *all Government subcontractors*, contracting officers might, without appropriate safeguards, be presented with numerous frivolous claims that the prime contractor would not have sponsored.") (emphasis added), *id.* (contending that "[b]y forcing the prime contractor to administer its subcontractor network, the Government permits prime contractors and subcontractors" to resolve contract disputes through "their

---

analysis is directed toward determining the legal rights of a surety upon a contractor's default.

familiar commercial procedures"), *id.* at 17 (concluding that "denying the subcontractors direct access" to the CDA would "forc[e] the prime contractor and the subcontractor to negotiate their disputes"); *see also Admiralty*, 156 F.3d at 1220 (citing S. Rep. No. 95-1118, at 16), *Fireman's Fund*, 313 F.3d at 1351–52 (same). Congress did not mention sureties when discussing the limits of the CDA's administrative remedies jurisdiction. *See generally* S. Rep. No. 95-1118, at 16–17. In *Admiralty* and *Fireman's Fund*, we equated a surety to a subcontractor without *any* support.

Our court has repeatedly turned to these two cases and specifically to the two pages of the Senate Report to support the assertion that a surety is not in privity with the Government upon a contractor's default. *See Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1321 (Fed. Cir. 2011) (relying on *Admiralty* and the Senate Report at pages 16 and 17 to support the assertion that "[t]his legislative history suggests that claims by third parties who are not in privity of contract with the government are not covered by the CDA"); *Hardie v. United States*, 19 F. App'x 899, 905 (Fed. Cir. 2001) (explaining that, in *Admiralty* and the court, in reliance on the Senate Report, determined that "[d]ue to the strong policy interest in maintaining a 'single point of contact' with the United States, there is a correspondingly strong resistance to extend the concept of 'privity' beyond the actual parties with which the United States originally contracted explicitly" (citation omitted)); *Ins. Co. of the W.,* 243 F.3d at 1370–71 (relying on *Admiralty* to conclude that "there is no such [privity] relationship" between the Government and a surety).

III. GENERAL PRINCIPLES OF CONTRACT LAW SHOULD APPLY

The roles and responsibilities of sureties—including the assumption of all legal rights—are well-defined within contract law and are applicable to both private and public contracts; they should apply here. A suretyship is a contractual relationship "where one person," the obligee, "has

undertaken an obligation and another person[,]" the surety, "is also under an obligation or other duty to the obligee" to perform that obligee's duty "rather than the [obligee]." Restatement (First) of Security § 82 (Am. Law Inst. 1941). Where an obligee, such as a contractor, enters into a contractual relationship, the surety agrees to assume the contractor's obligations—such as the performance and debts—of the contractor in the event of default. *See* Restatement (Third) of Suretyship & Guaranty § 1 (Am. Law Inst. 1996); *see also* Couch on Ins. §§ 1:14–15.

A surety benefits both the contractor and the party seeking performance, here the Government, because the surety's agreement with the contractor ensures that, in the event of default, the contracted performance is executed without significant delay (a "performance" bond) and subcontractors' valid costs are paid in a timely manner (a "payment" bond), while the cause of the default can be litigated. *See* 40 U.S.C. § 3131(b) (requiring Government contractors to possess both performance and payment bonds); *see also* Couch on Ins. §§ 1:15, 163:10. If a surety fails to execute its obligations under either bond, the Government may sue the surety. *See Balboa*, 775 F.2d at 1160 (concluding that "a surety, as [a] bondholder is as much a party to the Government contract as the contractor" and so may be sued by the Government).

If a contractor defaults on its performance, the surety possesses several ways to discharge the performance bond. The surety "is not obligated to perform the contract of the contractor though it may do so[,]" but it may "tak[e] over the contract and complet[e] performance, assum[e] liability for the government's costs in completing the contract that exceed the contract price, or . . . provid[e] funds to an insolvent contractor to complete the performance." Couch on Ins. § 164:14. The payment bond is discharged through negotiation or possibly litigation with subcontractors. *See* Couch on Ins. § 164:16.

A surety is different from a subcontractor in many respects. Significantly, the surety is obligated to engage and negotiate with the party seeking performance to ensure that it is completed. *See Dependable Ins. Co. v. United States*, 846 F.2d 65, 66–67 (Fed. Cir. 1988) (determining that a performance bond guarantees that the surety will insure that the contracted performance will be completed, even upon the default of the contractor). These differences are showcased in the appeal at hand, regarding the performance and payment bonds ("the Bonds") of Guarantee Company of North America ("GCNA") and Ikhana, LLC. Here, as in *Fireman's Fund*, the terms of the Bonds included an indemnity agreement in which the contractor assigned all rights under the contract and all legal actions and claims that the contractor may have had. *See* J.A. 2 (granting to GCNA, in the event of default, the right to "assert and prosecute any right or claim hereby assigned, transferred or otherwise conveyed in the name of [Ikhana] and to compromise and settle any such right or claim on such terms as it considers reasonable . . . in its sole and absolute discretion"); *see also Fireman's Fund*, 313 F.3d at 1346 (explaining that the surety's bond included the "General Indemnity Agreement" in which the contractor assigned "all of their rights under the contract . . . including . . . all actions, causes of actions, and claims and demands whatsoever which the [contractor] may have in . . . [the] contract covered by such [b]ond").

A surety must pick up where the contractor left off in the defaulted contract; in any normal surety relationship, this could include addressing pertinent pending litigation involving the contractor. Because of *Admiralty* and *Fireman's Fund*, a surety of a government contract has its hands tied when it comes to resolving ongoing litigation against the Government and executing performance. Indeed, this is the dilemma that faced GCNA following the Government's termination of Ikhana from the contract: Ikhana had filed claims against the Government for its

default termination, the Government sued GCNA on its performance bond, subcontractors sued GCNA on the payment bond, and GCNA stepped in to ensure the contract was executed despite the default. J.A. 2. To do so, GCNA entered into a settlement agreement with the Government to resolve the Government's claim on the performance bond. J.A. 257. GCNA tendered a new contractor to complete the work. J.A. 4. At the same time, GCNA agreed to dismiss Ikhana's appeal against the Government and the Government agreed to release GCNA from all liability relating to the performance and payment bonds. J.A. 4. This plan was stymied, however, as GCNA was denied standing before the ASBCA. J.A. 6.

The facts of this case are representative of the nature of a surety's work—bringing efficient resolution to contract disagreements, assuming financial risk, and ensuring execution—and of the necessity for granting sureties the legal rights they need to ensure speedy resolutions. The significance of this negotiating tool should not be understated. Lengthy delays in public projects could be problematic, expensive, and even dangerous. Moreover, sureties for government contracts may recognize the downstream problems of our precedent and either opt out of providing the service or, in recognizing the potential for heightened financial risk, charge a higher rate for their services. Whatever the outcome, the overall cost of doing business will be higher for all parties and U.S. taxpayers will be left paying the tab.

## CONCLUSION

The instant case is an appropriate vehicle to review our precedent and to resolve a question of exceptional importance, as the issue is raised squarely by these facts.